366 A.2d 1216

COMMONWEALTH of Pennsylvania

v.

Russell SHOATZ, Appellant (two cases).

Supreme Court of Pennsylvania.

Argued Nov. 21, 1974.

Decided Nov. 24, 1976.

548

Walter J. Collins, Jr., Philadelphia, for appellant.

F. Emmett Fitzpatrick, Dist. Atty., Richard A. Sprague, 1st Asst. Dist. Atty., Steven H. Goldblatt, Asst. Dist. Atty., Chief, Appeals Div., James Garrett, Philadelphia, for appellee.

Before JONES, C. J., and EAGEN, O'BRIEN, ROBERTS, NIX and MANDERINO, JJ.

## OPINION OF THE COURT

NIX, Justice.

Appellant Russell Shoatz was convicted by a jury of murder of the first degree, assault and battery with intent to murder, aggravated robbery and conspiracy, all of which stemmed from a series of events surrounding the August 29, 1970, shootings of two Philadelphia police officers. Post-trial motions for new trial and in arrest of judgment were denied by the court en banc and Shoatz was sentenced to life imprisonment.[1] This direct appeal followed.

1. Shoatz also received consecutive sentences of 10–20 years for aggravated robbery, 3½ to 7 years for aggravated assault with intent to murder and 1 to 2 years for conspiracy which were to run concurrently with the life sentence for murder. On appeal, we assumed jurisdiction of the murder conviction pursuant to Appellate Court Jurisdiction Act, Act of July 31, 1970, P.L. 673, No. 223, art. II, § 202(1), 17 P.S. § 211.202(1). The non-homicide

Initially, appellant raises several allegations of error by the suppression court. First, he attacks the legality of his arrest and search as violative of his rights under the Fourth Amendment. We disagree.

"Our responsibility upon review is to determine whether the record supports the factual findings of the lower court and the legitimacy of the inferences and legal conclusions drawn therefrom. *Commonwealth v. Bundy*, 458 Pa. 240, 328 A.2d 517 (1974); *Commonwealth v. Stafford*, 451 Pa. 95, 101, 301 A.2d 600, 604 (1974). Furthermore, we are to consider only the evidence of the prosecution's witnesses and that portion of the testimony offered by the defendant which is uncontradicted. See generally *Commonwealth v. Goodwin*, 460 Pa. 516, 333 A.2d 892 (1975); *Commonwealth v. Bundy*, supra." *Commonwealth v. Boone*, 467 Pa. 168, 173, 354 A.2d 898, 900 (1975).

The Commonwealth's evidence established that on January 19, 1972, at approximately 6:30 P.M., Officers Berry and King were in a radio patrol wagon when an unknown male approached them and stated: "There's three . . . dudes hanging around the dress shop across the street . . . I think they're going to hold the place up or either burglarize the place, because when they seen [sic] me they ran up the alley." The officers went across the street and searched the alley but their search was fruitless. As they came out onto the street a woman from the dress shop in question stated that three men had been "hanging around" outside the store and had entered the adjacent alley. The police informed her of their search and assured her they would maintain surveillance of the premises. The officers proceeded toward their patrol wagon at which point three men, two of whom were carrying suitcases, appeared on the steps of

convictions were appealed to the Superior Court and certified to this Court for consolidation and consideration.

the entrance to the alley [2] whereupon Officer King said, "Hold it gentlemen, I'd like to speak to you."

The two males with the suitcases dropped them and all three ran down the stairs and across the sidewalk to a car parked at the curb. With guns drawn the police ordered the men to halt and they complied. The three were then instructed to place their hands on the roof of the vehicle. Officer Berry proceeded to frisk Carter while King retrieved the suitcases. King opened the blue suitcase and discovered various automatic weapons, hand guns, explosives and ammunition. The three were placed under arrest. Additional help was summoned and a third officer arrived who "frisked" Holder and retrieved a P–38 pistol and an ammunition clip. The suspects were placed in a police vehicle and taken to the police station.

The suppression court found sufficient basis for an investigative stop and frisk by the officers. Moreover, the court concluded that the arrests occurred only after the gun was taken from Mark Holder as a result of this frisk, and the subsequent search of the suitcases was permissible as incident to the lawful arrests. However, the notes of testimony from the suppression hearing contradict these findings. The officers' testimony clearly indicated that the revolver was not recovered from Holder's waistband until after the officers had opened the suitcases and discovered their contents. Therefore the seizure of the gun could not have provided the legal basis for the search of the suitcases. At post-trial motions, the court en banc upheld the legality of the arrest on the theory that the suitcases were abandoned by the suspects and the contraband recovered therefrom provided probable cause for the arrests. We agree.

---

2. Appellant was carrying a white suitcase and a blue bag was in the possession of one Charles Carter. The third man, Mark Holder, was not carrying luggage.

■ The theory of abandonment is predicated upon the clear intent of an individual to relinquish control of the property he possesses.

Abandonment is primarily a question of intent, and intent may be inferred from words spoken, acts done, and other objective facts. *United States v. Cowan,* 2d Cir. 1968, 396 F.2d 83, 87. All relevant circumstances existing at the time of the alleged abandonment should be considered. *United States v. Manning,* 5th Cir. 1971, 440 F.2d 1105, 1111. Police pursuit or the existence of a police investigation does not of itself render abandonment involuntary. See *Abel v. United States,* supra; *United States v. Edwards,* 5th Cir. 1971, 441 F.2d 749; *Lurie v. Oberhauser,* 9th Cir. 1970, 431 F.2d 330. The issue is not abandonment in the strict property-right sense, but whether the person prejudiced by the search had voluntarily discarded, left behind, or otherwise relinquished his interest in the property in question so that he could no longer retain a reasonable expectation of privacy with regard to it at the time of the search. *United States v. Edwards,* supra, 441 F.2d at 753; cf. *Katz v. United States,* 1967, 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576. *United States v. Colbert,* 474 F.2d 174, 176 (5th Cir. 1973).

Moreover, it is well settled that no one has standing to complain of a search or seizure of property that he has voluntarily abandoned. *Abel v. United States,* 362 U.S. 217, 80 S.Ct. 683, 4 L.Ed.2d 668 (1960); *United States v. Colbert,* supra.

■ This Commonwealth has adopted the theory of abandonment of property only when it is shown that the seized evidence was not discarded as a result of unlawful police coercion.

Although abandoned property may normally be obtained and used for evidentiary purposes by the police, such property may not be utilized where the abandonment is coerced by unlawful police action.

As the Fifth Circuit noted in *Fletcher v. Wainwright:* "Several courts have considered this situation and have uniformly held that the initial illegality tainted the seizure of the evidence since the throwing was the direct consequence of the illegal entry. In such a situation it cannot be said that there was a 'voluntary abandonment' of the evidence. The only courts that have allowed the seizure of evidence that was thrown out the window have emphasized that 'no improper or unlawful act was committed by any of the officers' prior to the evidence being tossed out the window." 399 F.2d 62, 64 (5th Cir. 1968) (citations omitted). See also *Hobson v. United States,* 226 F.2d 890, 894 (8th Cir. 1955). (Footnote omitted). *Commonwealth v. Jeffries,* 454 Pa. 320, 326, 311 A.2d 914, 918 (1973).

See also, *Commonwealth v. Pollard,* 450 Pa. 138, 299 A. 2d 233 (1973). In the instant case, the suspects dropped their suitcases and attempted to flee in an automobile. This behavior indicated a clear intent to relinquish both control of the luggage as well as any expectation of maintaining the privacy of its contents. Thus, the only question which remains is the legitimacy of the police conduct prior to the moment the bags were dropped.

A review of the record fully establishes that the officers acted in a responsible and proper manner. They had been informed by two independent sources about the suspicious behavior of three males in the vicinity of a dress shop. These men had run into an adjacent alley when observed by one of the informants. Shortly thereafter, the officers observed three men carrying suitcases descending the steps of this same alleyway. Under these circumstances, the police officers acted appropriately in attempting to make a preliminary investigation as to the identity and activity of these individuals:

"The Fourth Amendment does not require a policeman who lacks the precise level of information neces-

sary for probable cause to arrest to simply shrug his shoulders and allow a crime to occur or a criminal to escape. On the contrary, Terry recognizes that it may be the essence of good police work to adopt an intermediate response. A brief stop of a suspicious individual, in order to determine his identity or to maintain the status quo momentarily while obtaining more information, may be most reasonable in light of the facts known to the officer at the time." (Citations omitted) *Adams v. Williams*, 407 U.S. 413, 145–46, 92 S.Ct. 1921, 1923; 32 L.Ed.2d 612 (1972).

See also, *Commonwealth v. Richards*, 458 Pa. 455, 327 A.2d 63 (1975).

We therefore conclude that the police activity prior to the abandonment of the suitcases was lawful. Accordingly, the search of the suitcases was not violative of appellant's Fourth Amendment protections.

■ Appellant next contends that his oral statement made to police approximately 26 hours after his arrest should have been suppressed because it was the product of an unnecessary delay and thus violative of Pennsylvania Rule of Criminal Procedure 118 (now 130) and our mandate in *Commonwealth v. Futch*, 447 Pa. 389, 290 A.2d 417 (1971).

Appellant was arrested at 6:45 P.M. on January 19, 1972, for illegal possession of weapons. At that time he identified himself as Augustus Van Horn. He was taken to the district police station and then transported to the Police Administration Building. Appellant received his Miranda warnings at 10:00 P.M. and was questioned for the next 45 minutes. Immediately thereafter appellant was photographed and fingerprinted whereupon his true identity was established. As a result, the police questioning focused upon the Von Colln murder case, in which appellant was a prime suspect.

At 11:00 P.M. a homicide detective informed Shoatz that the police were investigating the homicide and warned appellant of his constitutional rights. Shoatz indicated his willingness to answer questions without the assistance of counsel and spoke with police until 12:25 A.M. (the morning of January 20th). During this initial interview, appellant stated that he was an organizer of the Black Unity Council, a militant revolutionary organization located in West Philadelphia. The aim of the group was to arm themselves against the police. It was understood that each individual would act at the time and manner he deemed appropriate. All the meetings turned to the subject of violence. When questioned further Shoatz stated: "We meant to arm ourselves and to get the police because they were part of everything that we were against." Appellant then denied his participation in the shooting and claimed that he was in a bar in West Philadelphia at the time in question. Interviews continued over the next 20 hours. Throughout the course of the investigation, Shoatz reiterated his personal political views about alleged injustices by police but steadfastly denied the shooting. At 9:20 P.M., on January 20th appellant was asked directly whether he had killed Von Colln. Shoatz thereupon responded "Fundamentally, I did", but refused to elaborate any further. Appellant now contends that this statement should have been suppressed.[3] We do not agree.

Conceding that the 26-hour delay was unnecessary, that alone does not render the challenged response inadmissible.

**3.** The record of the suppression hearing reflects that appellant's *Futch* objection at that time was directed solely to the response, "Fundamentally, I did", but not to the other information elicited during the course of the interrogations. In his brief to this Court, appellant has implicitly attempted to expand this objection to also embrace other damaging admissions made during the questioning. We must reject this attempt to place before us at this juncture that which was not properly preserved for appellate review. *Commonwealth v. Clair*, 458 Pa. 418, 326 A.2d 272 (1974).

" . . . [I]t is immaterial from a *Futch* doctrine standpoint that the interrogation continued after the [initial interview] period. Since the information obtained during the subsequent period was merely repetitious, the appellant was not prejudiced. *Commonwealth v. Davis*, 460 Pa. 644, 334 A.2d 275 (1975); *Commonwealth v. Rowe*, 459 Pa. 163, 327 A.2d 358 (1974). In absence of prejudice to the accused, there is no justification for the imposition of the exclusionary rule of Futch." *Commonwealth v. Boone*, 467 Pa. 168, 177, 354 A.2d 898, 902 (1975). (Footnote omitted).

See also, *Commonwealth v. Coley*, 466 Pa. 53, 351 A.2d 617 (1976); *Commonwealth v. Rogers*, 463 Pa. 399, 344 A.2d 892 (1975); *Commonwealth v. Palmer*, 463 Pa. 26, 342 A.2d 387 (1975).

In substance the above-quoted cases reflect this Court's unwillingness to utilize the doctrine of exclusion where the challenged evidence resulting from the allegedly tainted police interrogation supplies nothing further than that which has been established through admittedly proper questioning. Reviewing appellant's response in context with other statements elicited during the course of the interviews, it is clear this comment merely reiterated his adherence to a revolutionary philosophy which he had consistently maintained. Up to the point of the challenged utterance, appellant's remarks could only have been interpreted as an admission of a participation in the conspiratorial design of the group to which he belonged. He consistently denied actual participation throughout the questioning. Taken in context, the statement "Fundamentally, I did" could only be construed as another way of stating his participation in the conspiratorial design and thus did not supply the prosecution with any further information it had not already received.

The underlying premise of this argument of appellant is that the statement could have been understood to

have been an admission to the actual shooting. We do not believe that such an interpretation could have reasonably been drawn from this statement in the context in which it was made. Accordingly, it is our view that the challenged utterance only reiterated that which had already been stated and its admission into evidence did not further prejudice appellant's position.

Appellant next assigns as error the failure of the suppression court to suppress the pre-trial photographic identifications by Pasqualle DiCamillo and Robert Grier. Upon review of the notes of testimony of the suppression hearing, we believe the hearing court's rulings were proper. DiCamillo testified that while driving north along the Cobbs Creek parkway on the date and time of the shootings, he heard sounds like firecrackers and saw a man fire a gun in the direction of a parked police van. DiCamillo then observed a second individual run across the street from the park and pass directly in front of his vehicle, requiring DiCamillo to stop abruptly. Although it was dusk, the witness testified the intersection was well lighted and afforded him a good opportunity to observe this individual for several seconds.[4] DiCamillo reported the incident to police and gave them a brief description of the men involved.

Grier stated that on August 29, 1970, he was stopped for a traffic light one block north of the scene of the crime, when his truck was commandeered at gunpoint by a young male who ordered him to drive to another section of the city. This episode consumed more than 30 minutes during which Grier was able to carefully study the man's features. Later that night, Grier spent several hours unsuccessfully leafing through pages of po-

---

4. Although DiCamillo was unswerving in his testimony, appellant implies that the limited opportunity for observation makes the identification unreliable. This argument however affects the weight to be accorded the testimony and not its admissibility. See *Commonwealth v. Kloiber*, 378 Pa. 412, 106 A.2d 820 (1954).

lice photographs in an attempt to identify the man. He was then shown eight additional loose pictures of various members of the Black Unity Council from which he immediately identified Shoatz.

On November 24, 1970, the police showed DiCamillo the same loose photographs and he selected the photograph of appellant as the man who ran in front of his car. At that time, DiCamillo stated that he could not be absolutely sure of the identification unless he saw the individual.

Appellant contends that the use of the eight photographs of members of the Council was unduly suggestive because all the individuals pictured did not possess sufficiently similar physical features. Appellant has failed however to show that the differences in appearance were in any way designed to suggest or did in fact suggest his photograph to the viewers. To the contrary, since the police investigation had indicated that the perpetrators of this crime were members of the Black Unity Council, it is only reasonable that pictures of the members of this group would be shown for this purpose. We therefore find no merit in this contention. *Cf. Simmons v. United States*, 390 U.S. 377, 88 S.Ct. 967, 19 L.Ed.2d 1247 (1968).

■ Appellant also argues that the dissimilarity in appearance of the lineup participants was unduly suggestive. After careful consideration of both the composite description of all participants and a review of the photographic color slides of the lineup itself, we do not agree. All participants wore the same clothing and had similar hair styles. Shoatz was neither the shortest nor the tallest of the group. While appellant appeared to have a slightly stockier build than most, another individual was heavier and the overall effect was diminished by the loose fitting overalls they wore. Although only appellant had a full beard, one man had a long mustache and an-

other wore large sideburns which covered part of his cheeks. Moreover, since neither DiCamillo or Grier remembered Shoatz as having a full beard at the time they observed him, we do not believe that this aspect of his appearance contributed to his identification.

Next, appellant argues that the identifications should have been suppressed because counsel had not formally undertaken his representation at the lineup. Under the specific facts of this case however, we do not believe that Shoatz was deprived of his constitutional safeguards during this proceeding. The underlying basis for requiring counsel at the lineup was set forth by the United States Supreme Court in *United States v. Wade,* 388 U.S. 218, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1968):

> Since it appears that there is grave potential for prejudice, intentional or not, in the pretrial lineup, which may not be capable of reconstruction at trial, and since presence of counsel itself can often avert prejudice and assure a meaningful confrontation at trial, there can be little doubt that for Wade the post-indictment lineup was a critical stage of the prosecution at which he was "as much entitled to said aid [of counsel] . . . as at the trial itself." *Powell v. Alabama,* supra, 287 U.S. 45, 57, 53 S.Ct. 55, at 60, 77 L.Ed. 158, 164, 84 A.L.R. 527.

Id. at 236–237, 87 S.Ct. at 1937 (footnote omitted).

This record establishes that two Public Defenders were present at the lineup. While they did not officially represent Shoatz, they nevertheless took an active part in the proceedings. These attorneys received copies of previous descriptions made by witnesses and consulted with appellant. When the original group of subjects appeared, the attorneys voiced their objections and required the police to make substitutions with individuals who more closely resembled appellant. Additionally, these attorneys made notes during the lineup and were

present when the victims made their identifications. (There is no suggestion that the identifications were not made independently or that there was any suggestive discussion by police with the witnesses prior to the lineup). Moreover, both testified as defense witnesses at the suppression hearing and gave their account of the proceedings.[5] Under these circumstances, we do not believe appellant's interests were unprotected.[6]

Accordingly, we find the determination of the suppression court was proper.

 Appellant contends that the introduction into evidence of certain photographic color slides of the deceased was highly prejudicial and inflammatory and requires the grant of a new trial. The question of admissibility of such evidence is a matter within the sound discretion of the trial court and only an abuse of that discretion will constitute reversible error. *Commonwealth v. Garrison,* 459 Pa. 664, 666, 331 A.2d 186, 187 (1975); *Commonwealth v. Petrakovitch,* 459 Pa. 511, 329 A.2d 844 (1974). Upon review of the record and the evidence in question, we are convinced the trial judge's ruling was proper.

During the trial the Commonwealth sought to introduce approximately 26 photographic slides which they

5. In analyzing the *Wade* requirement, it has been pertinently observed:

[W]e think the important question is whether the representation provided the defendant at the lineup was adequate (a) to safeguard the defendant in an identification process attended with hazards of serious unfairness, to wit, the suggestive manner with which such line-up confrontations can be conducted, and (b) to preserve for the defendant the ability to effectively reconstruct at trial the manner and mode of the lineup. In our view, if these purposes are met then the requirements in *Wade* are satisfied, whether the representation at the lineup be handled by the accused's own counsel or substitute counsel. . . . . *United States v. Sanders,* 322 F.Supp. 947, 950 (E.D.Pa.1971). aff'd, 459 F.2d 86 (3rd Cir.), cert. denied, 409 U.S. 860, 93 S.Ct. 146, 34 L.Ed.2d 106 (1972).

6. We also note that the suppression court had the photographic slides of the lineup to aid its determination.

contended would aid the pathologist in describing the nature of the wounds and the cause of death. Further, these slides helped to establish the brutal and premeditated manner in which the deadly weapon was used upon vital parts of the body from which the jury could infer the requisite specific intent for murder of the first degree.

> " 'In the trial of criminal cases photographs of the victim and of the scenes of the crime are admissible to aid the jury in their understanding of the alleged crime, the kind of crime it was, exactly what caused the victim's death and what, if any connection defendant had with it . . . ' " *Commonwealth v. Petrakovitch,* 459 Pa. at 522, 329 A.2d at 849.

In chambers, the trial judge ruled that 16 of the 20 slides to which the defense objected were inadmissible due to their highly gruesome and inflammatory nature. However, the remaining four slides which depicted the points of entry and exit of the bullets were admitted. Careful scrutiny of these slides indicates that practically all the blood had been removed from the wounds and that none of the pictures exhibited either the full body or facial view of the deceased. Moreover, these slides were viewed by the jurors for a very brief period of time and without undue emphasis. Compare, *Commonwealth v. Scaramuzzino,* 455 Pa. 378, 317 A.2d 225 (1975); *Commonwealth v. Woods,* 454 Pa. 250, 311 A.2d 582 (1973). Accordingly, we find that the slides were neither repugnant nor gruesome and thus were not of the inflammatory character that would outweigh their evidentiary value. *Commonwealth v. Gonzales,* 463 Pa. 597, 603, 345 A.2d 691, 694 (1975).

■■■■ Appellant urges that the admission into evidence at trial of the items found in his possession and the possession of his companions at the time of his arrest was error. As has been stated, at the time of his arrest

approximately one and one-half years after the incident, appellant along with his companions were found to have possessed numerous advanced military weapons and munitions. These items included two of the United States Army's most advanced automatic rifles or machine guns, the M-16, plastic explosives manufactured solely for military use and other various military-type of ammunition. It is now contended that this evidence was irrelevant and served only to inflame and prejudice the jury since appellant was not being tried for the possession of this property. In support of the decision to admit this testimony, the court en banc stated:

> "Inasmuch as the instruments and devices found on appellant consisted of guns, ammunition and explosives, all of which corresponded generically and some of which corresponded exactly to the type of ammunition used in the homicide, it was relevant as a circumstance to help identify appellant and to help to connect him with the crime of which he was accused . . . ."

In considering the question of relevancy, we have recently had the occasion to observe:

> "Any analysis of the admissibility of a particular type of evidence must start with a threshold inquiry as to its relevance and probative value. *Commonwealth v. Jones*, 459 Pa. 62, 66, 327 A.2d 10, 13 (1974); *Commonwealth v. McCusker*, 448 Pa. 382, 388, 292 A.2d 286, 289 (1972). We have cited with approval the test for relevance propounded by two leading evidentiary authorities, Wigmore and McCormick, *Commonwealth v. Jones*, supra; *Commonwealth v. Lippert*, 454 Pa. 381, 384, 311 A.2d 586, 587 (1973); *Commonwealth v. McCusker*, supra. Wigmore defines relevance in terms of two axioms, 'None but facts having rational probative value are admissible,' and, 'All facts having rational probative value are admissible, unless some spe-

cific rule forbids.' I Wigmore, Evidence §§ 9–10 at 289–95 (3rd Ed. 1940). McCormick suggests the following for determining relevance, . . . '[D]oes the evidence offered render the desired inference more probable than it would be without the evidence? . . . Relevant evidence then, is evidence that in some degree advances the inquiry, and thus has probative value, and is prima facie admissible.' McCormick, Evidence § 185 at 437–38 (See 2nd Ed. 1972)." *Commonwealth v. Walzack*, 468 Pa. 210, 360 A.2d 914 (1976).

We must thus determine the accuracy of the court en banc's appraisal that the introduction of this testimony assisted in establishing a circumstance "to help identify appellant and to help connect him with the crime of which he was accused." The Commonwealth proceeded upon the theory that appellant was an organizer of a militant revolutionary group located in West Philadelphia called the Black Unity Council. One of the avowed purposes of this organization was to arm themselves against the local police and gain retribution for various acts which they believe the police had perpetrated against the community. Moreover, the Commonwealth sought to prove that the incident in question was in fact committed by appellant and his organization through a carefully orchestrated conspiratorial scheme, intended to be the first of several such attacks upon the local police department.

The Commonwealth introduced evidence to show that appellant immediately after the event went into hiding and during a portion of that period stayed in the City of New York using various aliases. It was also their contention that he was still attempting to elude the police when he was apprehended and they offered the fact that an alias was given by him at the time of his arrest to support this inference. It is therefore their view that his possession or at least his association with those

in possession of such sophisticated weaponry at the time of his arrest, was indicative not only of his participation with the group at the time of the arrest, but in addition it established the continuity of his relationship from the time of the incident. When we consider the inaccessibility to the average member of the public, the type of weaponry found, and the unlikelihood of a newly formed association with the group after the event, particularly during a time when appellant was attempting to keep his whereabouts unknown to police officials, we must conclude that the court below properly deduced that a jury could reasonably infer that the possession of these weapons rendered the Commonwealth's desired inference of appellant's participation in the conspiratorial design more probable than it would have been without the introduction of such testimony. Cf. *United States v. Pentado,* 463 F.2d 355 (5th Cir. 1972) ; *People v. Miner,* 22 Mich. App. 673, 177 N.W.2d 719 (1970). With regard to the argument of the interval of time that dissipated any relationship that may have normally flowed from the possession and the connection with the event, it must be remembered that such a consideration is one for a jury to resolve in evaluating the weight of the probative value of the offered evidence and not its competency.

An even more compelling basis for finding the relevance of this testimony is the fact that during appellant's interrogation, he consistently maintained that he had disassociated himself from his organization's plans that included violent retaliation upon the police. He also asserted that his flight to New York was not associated with a sense of guilt, but rather occasioned by his fear that he would be unjustly set upon by the police because of his former associations with the group. The possession of these weapons, approximately 18 months after the events, shows that he was not a mere minion who had become disenchanted and attempted to sever

any former relationships but rather it is clearly indicative of one who continued his close and integral association during the time that he was able to allude the police. Since it is fundamental law that a ruling of the trial court can be sustained even where a trial court assigns an improper reason, this basis, i. e., the issue of credibility on a vital subject would necessarily have justified the introduction of this testimony. *Commonwealth v. Baker,* 466 Pa. 382, n.8, 353 A.2d 406, 411, n.8 (1976); *Borough of Wilkinsburg v. Sanitation Dept.,* 463 Pa. 521, 523, n.2, 345 A.2d 641, 642, n.2 (1975); *Commonwealth v. Dancer,* 460 Pa. 95, 101, n.5, 331 A.2d 435, 438, n.5 (1975). Finally, appellant charges that the court's instruction to the jury were defective because its summary of the evidence was unfavorable to his position. A review of the record, however, demonstrates that this argument has not been preserved for appellate review. No objections were made at trial to these aspects of the jury charge and no request for instructions on these points were made. *Commonwealth v. Riley,* 458 Pa. 390, 326 A.2d 384 (filed October 1974); *Commonwealth v. Carbonetto,* 455 Pa. 93, 314 A.2d 304 (1974); *Commonwealth v. Dancer,* 452 Pa. 221, 305 A.2d 364 (1973). Although appellant concedes the failure to properly raise these questions below, it is argued that in spite of our decision in *Commonwealth v. Clair,* 458 Pa. 418, 326 A.2d 272 (1974), and *Dilliplaine v. Lehigh Valley Trust Company,* 457 Pa. 255, 322 A.2d 114 (1974), the theory of basic and fundamental error should be applied to this case since the trial preceded those two decisions. First, there are numerous cases where we have applied the Clair doctrine to trials that have preceded our decision in *Clair.* Additionally, it is clear even under the theory of basic and fundamental error, these complaints could not have been so classified. Most of the objections are based on portions of the jury charge which have been taken out of context and when

read in context are clearly in accord with the evidence that had been presented at trial.

Judgment of sentence affirmed.

ROBERTS, J., filed a dissenting opinion in which MANDERINO, J., joined.

POMEROY, J., took no part in the consideration or decision of this case.

ROBERTS, Justice (dissenting).

I dissent. The majority today rules that an incriminating statement obtained after an unnecessary delay of at least 26 hours between arrest and preliminary arraignment was admissible at trial. The majority reaches its result by characterizing the challenged statement as a mere reiteration of prior statements elicited from appellant during the course of the police interrogation. It concludes that the statement did not prejudice appellant and therefore need not have been suppressed under Pa. R.Crim.P. 130 and *Commonwealth v. Futch,* 447 Pa. 389, 290 A.2d 417 (1972). I believe the challenged statement, obtained after 26 hours of police detention, cannot fairly be regarded as a mere reiteration of appellant's prior statements to the police. Because this statement, elicited after an unnecessary delay, substantially prejudiced appellant's position, it should have been suppressed under Pa.R.Crim.P. 130 and *Commonwealth v. Futch,* supra.

On August 29, 1970, police sergeant Francis Von Colln was shot and killed while sitting at his desk in a guard house in Philadelphia's Cobb Creek Park. Although appellant immediately became a suspect, he could not be located during the months that followed.

At about 6:45 p. m., on January 19, 1972, police officers investigating a possible robbery stopped appellant and two others and discovered that they were in possession of a number of weapons. The police did not at this time recognize appellant as a suspect in the Von Colln

slaying. Appellant was arrested, apparently for a weapons offense, and was transported to police headquarters.

Three hours later, a detective who had taken part in the investigation of the Von Colln homicide identified appellant as a suspect in that case. In the following 50 minutes, appellant was informed of his constitutional rights, fingerprinted, and photographed. Upon completion of those procedures, interrogation commenced.

During the first 26 hours of appellant's incarceration he denied any involvement in the Von Colln slaying, although he did admit membership in the Black Unity Council, an organization which the police suspected had a role in the Von Colln killing. Appellant admitted that the Council had discussed the use of violence against the police. Despite his initial denial of complicity in the Von Colln slaying, the police questioned appellant for 15 of the next 21½ hours. At about 8:30 p. m., January 20, almost 26 hours after his arrest, he was asked "Did you shoot and kill Sergeant Von Colln in the Park Guard Headquarters on August 29, 1970?" Appellant replied, "Fundamentally I did." After making this statement, appellant refused to elaborate. The police then summoned appellant's parents by telephone and, after an additional hour of interrogation, permitted appellant to talk with his parents. He was arraigned some time after 11:00 p. m., January 20, at least 28 hours after his arrest. Appellant contends that his statement at 8:30 p. m., on January 20, should have been suppressed.

When a person is arrested, our rules of criminal procedure mandate that he be taken without unnecessary delay before a judicial officer for preliminary arraignment. Pa.R.Crim.P. 122 & 130. In *Commonwealth v. Futch*, supra, we held that if evidence obtained during an unnecessary delay has any reasonable relationship whatsoever to the delay, it is not admissible at trial. We have employed a three-part test for determining whether evidence is inadmissible under the *Futch* rule.

"The delay must be unnecessary; evidence that is prejudicial must be obtained; and the incriminating evidence must be reasonably related to the delay."

*Commonwealth v. Williams*, 455 Pa. 569, 572, 319 A.2d 419, 420 (1974).[1]

Appellant has satisfied the first and third prongs of *Commonwealth v. Williams*, supra. The Commonwealth has conceded that the delay in this case was unnecessary. In addition, the incriminating statement was undeniably a product of the unnecessary delay. From the time the police recognized appellant as a suspect in the Von Colln slaying, appellant was willing to discuss with them his membership in the Black Unity Council and his relationships with other suspects, but he steadfastly denied involvement in the slaying. Only after prolonged incommunicado incarceration and interrogation did he make the incriminating statement.

The majority, however, asserts that appellant's statement that "fundamentally" he killed Von Colln was not prejudicial. According to the majority, appellant's statement "did not supply the prosecution with any further information it had not already received" and thus "did not further prejudice appellant's position." I cannot agree.

In his prior statements to the police, appellant admitted that he was a member of an organization which discussed the use of violence against the police, but claimed that he never participated in the actual planning of such acts. His statement that "fundamentally" he killed Von Colln went beyond his prior admission that he was a

1. A more general formulation of the *Futch* inquiry involves a single determination whether a "nexus" exists between the unnecessary delay and the challenged evidence. See e. g., *Commonwealth v. Tingle*, 451 Pa. 241, 301 A.2d 701 (1973). In this analysis, the prejudicial nature of the challenged evidence must be shown in order to establish the requisite nexus. See *Commonwealth v. Palmer*, 463 Pa. 26, 342 A.2d 387 (1975); *Commonwealth v. Rowe*, 459 Pa. 163, 327 A.2d 358 (1974).

member of the Black Unity Council. It permitted the jury to infer from appellant's own words that he had participated in some fashion in the Von Colln homicide, whereas in his prior statements appellant denied participation in that act or any other act of violence.

The majority errs in stating that appellant's statement "could only be construed as another way of stating his participation in the conspiratorial design." Appellant had not previously admitted participation in a "conspiratorial design." He had only admitted that he was a member of an organization. His statement that "fundamentally" he killed Von Colln linked appellant specifically to the homicide and thus was considerably more damaging than his mere admission of membership in the Black Unity Council. Cf. *Scales v. United States,* 367 U.S. 203, 224–25, 81 S.Ct. 1469, 1484, 6 L.Ed.2d 782 (1961).

In this respect, the prejudicial impact of the challenged admission was substantial. In its charge, the court gave the following instruction on aiding and abetting.

"It is the Commonwealth's theory that the defendant aided and abetted others in the willful, deliberate, and premeditated murder of Sergeant Von Colln.

"One is an aider and abettor in the commission of any crime that he has joined in its commission. If he was an active partner in the intent which was the crime's basic element, the least degree of concert or collusion between the parties to an illegal transaction makes the act of one the act of all.

"The guilt or innocence of the abettor is not determined by the quantum of his advice or encouragement. If it is rendered to induce another to commit the crime and actually had this effect, no more is required."

The jury had to be satisfied beyond a reasonable doubt not just that appellant was a member of the Black Unity

Council, but also that he knew of the plan to kill Von Colln and had in some way encouraged it. In his closing argument, the prosecutor used appellant's admission to support his theory that appellant was a conspirator in the Von Colln slaying. As used by the prosecution, appellant's statement was not, as the majority asserts, a mere reiteration of his prior admission that he was a member of the Black Unity Council. Rather, the statement permitted the jury to infer from appellant's own words what he had unequivocally denied in his earlier statements to the police, i. e., that he had participated in the killing. In the light of the court's charge and the prosecutor's closing argument, appellant's statement that "fundamentally" he killed Von Colln might have convinced the jury that even if appellant was not the man who fired the fatal bullet, he had encouraged the crime, shared in the intent to commit it and thus was guilty as an aider and abettor.

Appellant's admission was prejudicial and should have been excluded. This Court has held that where a defendand initially denies his involvement in a crime to the police and afterwards, following a period of unnecessary delay between arrest and preliminary arraignment, admits complicity, a nexus between the admission and delay is established requiring suppression of the statement. See e. g., *Commonwealth v. Cherry*, 457 Pa. 201, 321 A.2d 611 (1974); *Commonwealth v. Tingle*, 451 Pa. 241, 301 A.2d 701 (1973).[2] The trial court's failure to suppress the statement in this case constituted reversible error.

I would reverse and remand for a new trial.

MANDERINO, J., joins in this dissenting opinion.

2. The majority relies on cases which are inapposite to the situation presented here. In those cases, the statements taken from the accused after unnecessary delay were essentially a reiteration of prior untainted admissions and thus did not further prejudice the accused. Here, appellant's statement, taken after 26 hours of unnecessary delay, differed substantially from his prior statements and seriously prejudiced his position.