393 A.2d 23

COMMONWEALTH of Pennsylvania, Appellee,

v.

Christopher E. MARTIN, Appellant (two cases).

Supreme Court of Pennsylvania.

Submitted April 11, 1978.

Decided Oct. 5, 1978.

516

Manuel Grife, Philadelphia, for appellant.

Edward G. Rendell, Dist. Atty., Steven H. Goldblatt, Deputy Dist. Atty. for Law, Robert B. Lawler, Chief, Appeals Div., Glen Gitomer, Philadelphia, for appellee.

Before EAGEN, C. J., and O'BRIEN, ROBERTS, POMEROY, NIX, MANDERINO and LARSEN, JJ.

## OPINION OF THE COURT

EAGEN, Chief Justice.

Appellant, Christopher E. Martin, was convicted after a jury trial in Philadelphia of murder of the second degree and robbery of Willie Keaton, of attempted robbery of Jerome White, and of criminal conspiracy to commit the foregoing crimes. Martin was sentenced to life imprisonment on the murder conviction to run concurrently with a sentence of not less than five nor more than fifteen years imprisonment on the robbery charge. Sentence on the other convictions was suspended. These appeals followed.[1]

The evidence presented at trial, viewed in a light most favorable to the Commonwealth as the verdict winner, establishes the following:

On July 13, 1975, between 1:00 and 1:30 a. m., the decedent, Keaton, and White left together from a bar on the corner of Twenty-eighth and York Streets, Philadelphia.

---

1. Martin originally appealed the judgments of sentence imposed on the robbery, attempted robbery, and conspiracy counts to the Superior Court which certified these appeals here.

While they were walking near the intersection of Newkirk and Cumberland Streets, a short distance from the bar, they were approached from behind and White heard a voice say, "Give it up." White understood "it" to mean money. White turned around to find himself confronted by Martin who attacked him and prevented him from going to the aid of Keaton who was under attack from three or four other males. White was able to break away from Martin and ran for his aunt's house around the corner, but was stabbed in his left arm by Martin just before he fled. White's aunt called the police and, upon returning five minutes later to the place where Keaton and he had been attacked, Keaton was found lying on the ground, bleeding, trouser pockets inside out, his wallet and papers strewn about, and some small change beneath the wallet. The police arrived and found Keaton lying in a pool of blood. He was taken to the Medical College of Pennsylvania Hospital and pronounced dead upon arrival. The cause of Keaton's death was determined to be stab wounds of his right front chest, left arm, and mid-back.

In these appeals, Martin contends that his motion in arrest of judgment should have been granted since the evidence was insufficient to sustain guilty verdicts, and that he is entitled to a new trial on the grounds that the circumstances of the pretrial photographic identification made by White was violative of his constitutional right to due process, and that the subsequent in-court identification was tainted by the prior out-of-court identification.

In regard to Martin's first contention challenging the sufficiency of the evidence, our standard is whether, viewing all the evidence admitted at trial in the light most favorable to the Commonwealth and drawing all reasonable inferences favorable to the Commonwealth, there is sufficient evidence to enable the trier of fact to find every element of the crime(s) charged. *Commonwealth v. Bastone,* 466 Pa. 548, 552, 353 A.2d 827, 829 (1976). In the instant case, White's testimony which the jury accepted, as is evidenced by their returning a guilty verdict, was clearly

sufficient. While it is true that there were some differences between the testimony of White and that of one Charles Boswell, the bartender who testified on behalf of Martin as to events preceding the incident in question, these discrepancies were questions of fact, and thus were for the jury to resolve. *Commonwealth v. Farquharson,* 467 Pa. 50, 59, 354 A.2d 545, 550 (1976). (Boswell testified that Keaton was drunk at 11:30–11:45 p. m. and left the bar alone at that time while White remained in the bar.)

Martin next contends that he is entitled to a new trial on the ground that the circumstances of the pretrial photographic identification made by White was violative of his constitutional right to due process since White was pressured by the police into making an identification, and the photographic array itself was suggestive. For the following reasons, these claims are meritless.

Although White gave police a good description of his assailant immediately after the incident on July 13, his wounds required him to be hospitalized. Thus, White did not come to the Police Administration Building until July 21 to review photographs for possible identification of his assailant. A police-detective, Stephens, testified that working from White's previous description, an effort was made to assemble photographs of males of the same race, age, complexion, and hair-style, residing in the vicinity of the incident. Martin had not yet been arrested when the nine photographs in question with no identifying data visible were shown to White by placing them in a horizontal row on a table in front of him, without any statement as to whether his assailant's picture was among them. White selected two photographs, but refused to further identify for Detective Stephens which of them was his actual assailant because he said he was afraid of retaliation.

Detective Stephens, without placing any mark on the nine photographs, then gave them to Detective Gallo. After attempting to allay White's fear of reprisal, this detective showed them to White one on top of another in the pile. White then looked through the pile, withdrew Martin's pic-

ture, stated Martin was his assailant, and signed it on the back.

■ Under our standard of review of suppression court hearings, the findings of the trier of fact, supported by the record, may not be disturbed. *Commonwealth v. Sparrow,* 471 Pa. 490, 497, 370 A.2d 712, 715 (1977). In relation to the events surrounding the pretrial photographic identification in the instant case, the findings related in the paragraphs above are amply supported by the record.

■ A reversal of the judgment of sentence is appropriate only if the photographic identification procedure was so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification. *Simmons v. United States,* 390 U.S. 377, 384, 88 S.Ct. 967, 19 L.Ed.2d 1247 (1968). In the instant case, neither the testimony of White nor the detectives support Martin's contention that White's pretrial photographic identification was the product of overbearing police pressure. White was not ordered to select a picture nor was he told that Martin's picture or anyone suspected of the crime was in the array. In addition, Martin's claim that the array of photographs was suggestive is without merit. The suppression court found that the nine photographs were of "young negro males of approximately the same age as the petitioner (Martin), were members of the negro race, had similar hair styles, and for the most part were of the same complexion." The mere fact that by happenstance out of the nine photographs, Martin and another person were wearing light colored outer clothing, whereas the other seven persons depicted were wearing dark colored outer clothing will not render an otherwise fair photographic display infirm. See *Commonwealth v. Shoatz,* 469 Pa. 545, 559–60, 366 A.2d 1216, 1223 (1976).

■ Since the pretrial photographic identification has been determined not to be constitutionally infirm, Martin's third contention that the in-court identification of himself by White was impermissibly tainted by the prior pretrial identification must fail.

Judgments of sentence affirmed.