J-S20038-24

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| ANTOINE WILLIAM MCNEAL | : | |
| | : | |
| Appellant | : | No. 1317 MDA 2023 |

Appeal from the Judgment of Sentence Entered February 25, 2019
In the Court of Common Pleas of Luzerne County Criminal Division at
No(s): CP-40-CR-0001933-2017

BEFORE:   OLSON, J., KUNSELMAN, J., and STEVENS, P.J.E.[*]

MEMORANDUM BY STEVENS, P.J.E.:                    **FILED: JULY 22, 2024**

Appellant, Antoine William McNeal, appeals *nunc pro tunc* from the judgment of sentence[1] entered in the Court of Common Pleas of Luzerne County following his conviction by a jury on the charges of third-degree murder, criminal use of a communication facility, tampering with or fabricating physical evidence, and robbery.[2]  After a careful review, we affirm.

The relevant facts and procedural history are as follows: On January 19, 2017, the police filed a criminal complaint against Appellant, and the magisterial district court issued an arrest warrant for Appellant in connection

---

[*] Former Justice specially assigned to the Superior Court.

[1] As discussed *infra*, Appellant's direct appeal rights were reinstated via the Post Conviction Relief Act ("PCRA"), 42 Pa.C.S.A. §§ 9541-46.

[2] 18 Pa.C.S.A. §§ 2501(a), 7512(a), 4910(a), and 3701(a)(1)(i), respectively.

with the shooting death of Brandon Smith ("the victim") on January 18, 2017, in Nanticoke, Pennsylvania. Appellant was not apprehended by police until approximately April 19, 2017, at which time bail was denied. On June 14, 2017, the Commonwealth filed an Information charging Appellant with the offenses indicated *supra*.

On March 2, 2018, Appellant filed a counseled pre-trial motion seeking to suppress the evidence obtained by the police from their warrantless search of his cell phone, a Samsung Galaxy SS, pursuant to the Fourth Amendment to the United States Constitution and Article I, § 8 of the Pennsylvania Constitution. Appellant's Motion to Suppress, filed 3/2/18, at 1. The Commonwealth filed a brief in opposition to Appellant's motion to suppress averring that (1) the dialing of and viewing of a phone number (570-***-4534) on the Samsung Galaxy SS's display was not a search, (2) Appellant had no reasonable expectation of privacy in the Samsung Galaxy SS since he abandoned it, and (3) discovery of the evidence was inevitable. ***See*** Commonwealth's Brief in Opposition, filed 3/12/16.

On September 26, 2018, the trial court held a suppression hearing at which the Commonwealth presented the testimony of Pennsylvania State Police Trooper Edward Urban. Appellant neither testified at the suppression hearing nor offered any witnesses on his behalf.

Trooper Urban testified that, on January 18, 2017, he was called to investigate a homicide, which occurred at approximately 2:00 a.m. on Church

Street in Nanticoke. N.T., 9/26/18, at 5. By the time he arrived on the scene, the area of the shooting had been taped off, and the only people present were the victim's family members and responding law enforcement officers. *Id.* at 6-7. The victim had been transported to the hospital prior to Trooper Urban's arrival. *Id.*

Trooper Urban indicated that, at the time he arrived on the scene, there was no suspect in the shooting. *Id.* at 6. He explained the "scene of the crime" consisted of the victim's family's van that was "parked on the street in front of the residence. So, the scene consisted of mainly the van, and any evidence that trailed from the van back into the residence." *Id.* at 7. He indicated the general idea was "that something had happened in the van and then [the victim] went into the house." *Id.* The trooper testified there was blood in the van, and there was "a little bit of disarray" in the van. *Id.* He noted that the victim's family members informed officers on the scene that the victim went to the van and then came back into the family's residence with gunshot wounds. *Id.*

Trooper Urban testified that, as part of the investigation, three cell phones were recovered. *Id.* at 8. Specifically, a member of the victim's family gave the police one cell phone and explained that it was the victim's cell phone, which the victim had been using just prior to the shooting. *Id.* This cell phone was "a basic flip phone." *Id.* Trooper Urban testified that the victim's flip phone was taken back to the state police barracks where the

- 3 -

troopers went through the text message history, as well as the call history. *Id.*

The trooper testified that, based on an examination of the victim's flip phone, the police generated leads and eventually probable cause for a phone order. *Id.* In this vein, Trooper Urban explained that the victim's mother reported to the police that the victim was on his flip phone immediately prior to the shooting, so Trooper Urban examined the history of the flip phone to discover the substance of the victim's conversations. *Id.* at 9-10. On the victim's flip phone, Trooper Urban found "a text message trail with another phone—unknown phone number indicating—the setting up of a drug deal." *Id.* at 10. Trooper Urban testified that by "unknown phone number," he meant that the flip phone revealed a phone number (570-***-6088) with whom the victim was communicating, but the flip phone did not contain a name next to the 6088 number. *Id.*

Trooper Urban further testified that the substance of the victim's text message with the 6088 number involved the discussion of prices and quantities of drugs, as well as the victim providing his address. *Id.* The trooper indicated the text message conversation began an hour prior to the shooting and did not end until just before the victim's mother made the 911 call for help. *Id.* at 11.

Trooper Urban testified that two other cell phones, an LG with a smashed screen and a Samsung Galaxy SS, were recovered by the Forensic Services

Unit from the van for which the police received consent to search.  *Id.* at 7, 9.  When these two phones were collected, they were powered off and secured in the state police evidence room.  *Id.* at 11.  At this point in the investigation, the police did not know to whom these two phones belonged.  *Id.* at 9.

Trooper Urban testified that, at around 8:00 a.m. on January 18, 2017, he researched the 6088 number and confirmed with Verizon that it was a number issued by Verizon.  *Id.* at 11.  At this point, the trooper "started a probable cause affidavit for a pen register[3] [and] trap and trace device[4] for that [6088] phone number."  *Id.* (footnotes added).  He noted a trial court judge signed an order for the pen register and trap and trace device, which "is basically an order…served upon the phone company directing them to

---

[3] A "pen register" is relevantly defined as follows:
> A device which is used to capture, record or decode electronic or other impulses which identify the numbers dialed or otherwise transmitted, with respect to wire or electronic communications, on the targeted telephone.  The term includes a device which is used to record or decode electronic or other impulses which identify the existence of incoming and outgoing wire or electronic communications on the targeted telephone.

18 Pa.C.S.A. § 5702 (definitions).

[4] A "trap and trace device" is relevantly defined as follows:
> A device which captures the incoming electronic or other impulses which identify the originating number of an instrument or device from which a wire or communication was transmitted. The term includes caller ID, deluxe caller ID or any other features available to ascertain the telephone number, location or subscriber information of a facility contacting the facility whose communications are to be intercepted.

18 Pa.C.S.A. § 5702 (definitions).

provide [the police] with call detail information in real time." *Id.* The trooper indicated that, *inter alia*, the call detail in real time provides the police with coordinates as to where a phone is physically located at a specific time, as well as provides information as to other phone numbers with which the user of the phone was communicating at specific times. *Id.* at 12. Trooper Urban indicated:

> The call detail reports generally just give [the police] a listing of the raw numbers of contacts. Whether they're voice to voice or SMS, which is text messaging, [the police] have to put in a preservation order if [they] want detailed information. Most companies don't retain the actual content of a text message. Some do. Some don't. Every company has a different protocol on that. When [the police] get a [call detail in real time] report back, it's generally just metadata.

*Id.*

Trooper Urban testified that, after the trial court judge signed the pen register, as well as the trap and trace device order, the trooper emailed it to the state police's electronic surveillance section. *Id.* at 14. Pursuant to the pen register and trap and trace device order, Verizon provided information regarding the 6088 number. *Id.* Specifically, "[t]he information that Verizon started providing [to the police] was that they believed the phone physically was close to our crime scene. And at some point, it had been manipulated because they lost a signal, that it had been powered off." *Id.* Verizon supplied the historical data for the 6088 number. *Id.* This data indicated that, within an hour or two after the victim's mother made the 911 call at 2:00 a.m., the original number for the phone (the 6088 number) was changed to a new phone

number (570-***-4534). *Id.* Specifically, "the custodian of [the 6088] number went into the Verizon system and changed it." *Id.* Since the new 4534 number belonged to the same account holder as the old 6088 number, Verizon indicated that, if anyone used the phone with the 4534 number, they would provide the call details to the police for the 4534 number as well. *Id.* at 15.

The pen register and trap and trace device showed no outgoing calls or texts for the new 4534 number; however, between the hours of 3:10 a.m. and 7:29 a.m. on January 18, 2017, the 4534 number received nine incoming calls from 570-***-8136. *Id.* at 16. Thus, on January 19, 2017, Trooper Urban spoke with the victim's mother and asked additional questions about the three phones, which the police had in their custody. *Id.* The victim's mother revealed that, in addition to the flip phone, the LG with a smashed screen, which the police recovered from the van, belonged to her son, the victim. *Id.* at 17. However, she had no idea to whom the Samsung Galaxy SS belonged. *Id.* Believing the Samsung Galaxy SS was the phone with the 6088 number (later changed to the 4534 number), Trooper Urban powered up the Samsung Galaxy SS and dialed the 4534 number from the police evidence room's phone. *Id.* The Samsung Galaxy SS rang and displayed the police evidence room's phone number. *Id.* Trooper Urban powered off the

Samsung Galaxy SS and obtained a search warrant to conduct a Cellebrite[5] analysis on the phone. *Id.* at 18.

Meanwhile, based on the information provided by Verizon pursuant to the trial court's order, Trooper Urban discovered that, at around the time of the shooting, someone using the phone with the 8136 number had called the 6088 number. *Id.* The 8136 number belonged to Wakeelah Moore, and, when the trooper spoke to Ms. Moore, she confirmed the 6088 number (later changed to the 4534 number) belonged to her paramour, Appellant. *Id.* at 15-16. Trooper Urban confirmed that, on the night of the shooting, he did not see Appellant at the scene. *Id.* at 16.

On cross-examination, Trooper Urban confirmed that the victim's mother made the 911 call at approximately 2:00 a.m., and he arrived on the scene at approximately 4:00 a.m. *Id.* at 19. At the time of the trooper's arrival, the only phone that had been provided to the police was the victim's flip phone, which was not in the van. *Id.* Specifically, someone gave the flip phone to Trooper Fedor, and the victim's mother confirmed at the scene that the flip phone belonged to her son, the victim. *Id.* at 20. The trooper again confirmed "the other two [phones] weren't collected until later after the

---

[5] When performing an extraction on a cell phone, police often use software called "Cellebrite." *See Commonwealth v. Knoble*, 188 A.3d 1199 (Pa.Super. 2018).

Forensic Services Unit did their processing by the numbers. So, they were collected a couple [of] hours later, physically collected." *Id.*

Regarding the flip phone, Trooper Urban testified that, when he applied for and received an order for a pen register and trap and trace device for the 6088 number, he also applied for and received a separate order for the phone number belonging to the flip phone. *Id.* However, he admitted that, prior to getting a court order to search the flip phone, he opened the flip phone and could see what was on the display, including the history trail. *Id.* at 20-21. He noted that, at this time, he did not get consent from the victim to access the phone because the victim was already deceased. *Id.* at 20. The trooper could not remember whether, after serving the court order for the flip phone, the phone came back with the victim as the subscriber or as a "pay-as-you-go" phone. *Id.* at 22.

Regarding the Samsung Galaxy SS phone, Trooper Urban reiterated the phone was removed from the van by the Forensics Services Unit during the crime scene processing, which occurred a few hours after the 911 call. *Id.* at 24. The Samsung Galaxy SS phone was powered off when it was collected and secured in the evidence room. *Id.* Trooper Urban indicated that, by the time he received the pen register and the trap and trace device order at approximately 12:09 p.m. on January 18, 2017, the Samsung Galaxy SS phone would have already been powered off and placed in the evidence room. *Id.* He noted that, after the Samsung Galaxy SS phone number was changed,

pursuant to the pen register and trap and trace device order, Verizon reported there was no new outgoing activity on the phone. *Id.* at 27. Trooper Urban confirmed that, after he spoke with the victim's mother on January 19, 2017, and discovered the Samsung Galaxy SS did not belong to the victim, he powered up the Samsung Galaxy SS without consent from whomever may have owned the phone and without a warrant. *Id.* at 28. The trooper noted the reason he powered up the phone at that point was to try to determine to whom the phone belonged. *Id.* Once the trooper determined the new 4534 number belonged to the Samsung Galaxy SS, the trooper powered off the phone, and he secured a warrant for the contents of the cell phone. *Id.* at 29-30.

On redirect examination, Trooper Urban confirmed that the 4534 number, which he dialed on January 19, 2017, and discovered was the new number for the Samsung Galaxy SS, was supplied to the state police by Verizon on January 18, 2017, pursuant to the pen register and trap and trace device order for the 6088 number. *Id.* at 31.

At the conclusion of all evidence, by order and opinion filed on November 30, 2018, the trial court denied Appellant's motion to suppress. Specifically, the trial court held the search of the Samsung Galaxy SS was minimally invasive, Appellant abandoned the Samsung Galaxy SS, and the evidence at issue would have been inevitably discovered by lawful means.

On January 7, 2019, Appellant proceeded to a jury trial, at the conclusion of which the jury convicted him of the offenses indicated *supra*. On February 25, 2019, the trial court sentenced Appellant to an aggregate of 22 years and 4 months to 44 years and 8 months in prison. Appellant filed a timely, counseled post-sentence motion, which was denied by operation of law. He then filed a timely counseled direct appeal.

On direct appeal, concluding Appellant did not adequately develop his appellate issue in his brief, this Court found waiver. Accordingly, we affirmed his judgment of sentence on November 17, 2020. Appellant filed a petition for allowance of appeal, which our Supreme Court denied on November 8, 2021.

On August 15, 2022, Appellant filed a timely, *pro se* PCRA petition seeking the restoration of his direct appeal rights *nunc pro tunc*. The PCRA court appointed counsel, who filed a supplemental PCRA petition on May 10, 2023. By order entered on August 22, 2023, the PCRA court reinstated Appellant's direct appeal rights *nunc pro tunc*. This counseled appeal followed on September 20, 2023, and all Pa.R.A.P. 1925 requirements have been met.

On appeal, Appellant contends the trial court erred in denying his motion to suppress the search of his Samsung Galaxy SS. First, Appellant claims the trooper improperly conducted a warrantless search of his Samsung Galaxy SS when he powered on the phone while it was in the evidence room, as well as when he checked to see if the number dialed from the police evidence room's

phone was displayed as the phone number for the Samsung Galaxy SS. Appellant suggests if the trooper wanted any information from the cell phone, including the phone number assigned to the cell phone, he was required to secure a warrant for this purpose.

Second, Appellant claims he did not abandon the Samsung Galaxy SS since he did not voluntarily discard, leave behind, or relinquish any interest in the cell phone. Appellant contends he merely lost his cell phone, and it was found in the van by the police. He asserts that, at all times, he had an actual (subjective) expectation of privacy in his cell phone, and the expectation of privacy is one that society is prepared to recognize as reasonable.

Third, Appellant claims the discovery of the evidence on the Samsung Galaxy SS, including the phone number and account holder for the cell phone, was not subject to the inevitable discovery rule.

For the reasons discussed *infra*, we conclude the trial court properly held Appellant abandoned his Samsung Galaxy SS, and, thus, he had no reasonable expectation of privacy in the phone.

Our standard and scope of review is well-settled:

> Our standard of review of a trial court's ruling on a suppression motion is whether the factual findings are supported by the record and whether the legal conclusions drawn from those facts are correct. We are bound by the facts found by the trial court so long as they are supported by the record, but we review its legal conclusions *de novo*. The trial court has sole authority to pass on the credibility of witnesses and the weight to be given to their testimony. Our scope of review is limited to the record developed at the suppression hearing, considering the evidence

presented by the Commonwealth as the prevailing party and any uncontradicted evidence presented by the defendant.

*Commonwealth v. Rivera*, ___ A.3d ___, 2024 WL 2308204, *3 (Pa.Super. filed 5/22/24) (quotation marks, quotations, and citations omitted).

Both the Fourth Amendment of the United States Constitution and Article 1, Section 8 of the Pennsylvania Constitution "guarantee individuals freedom from unreasonable searches and seizures." *Commonwealth v. Bostick*, 958 A.2d 543, 550 (Pa.Super. 2008) (citation omitted). However, the Fourth Amendment and Article I, Section 8 only provide their protections from unreasonable searches and seizures to items that, at the time of the search or seizure, remain within a zone of privacy that the two constitutions are willing to shield from the government's view. If the item seized or searched is outside that zone of privacy, then the defendant lacks standing to challenge a search or seizure of it. *See Commonwealth v. Kane*, 210 A.3d 324, 330 (Pa.Super. 2019) (holding that a smartphone deliberately hidden inside a dormitory bathroom to video the people therein was "abandoned property" for constitutional purposes).

> Thus, "[a] defendant must show that he had a privacy interest in the place invaded or thing seized that society is prepared to recognize as reasonable." *Commonwealth v. Enimpah*, 630 Pa. 357, 106 A.3d 695, 698 (2014). "The expectation of privacy is an inquiry into the validity of the search or seizure itself; if the defendant has no protected privacy interest, neither the Fourth Amendment nor Article I, § 8 is implicated." *Id.* at 699.
>
> This Court has found that an expectation of privacy will exist when the individual exhibits an actual or subjective expectation of privacy, and that expectation is one that society is prepared to

- 13 -

recognize as reasonable. *Commonwealth v. Jones*, 874 A.2d 108, 118 (Pa.Super. 2005). In determining whether a person's expectation of privacy is legitimate or reasonable, we must consider the totality of the circumstances and the determination "ultimately rests upon a balancing of the societal interests involved." *Commonwealth v. Peterson*, 535 Pa. 492, 636 A.2d 615, 619 (1993) (citations omitted). "The constitutional legitimacy of an expectation of privacy is not dependent on the subjective intent of the individual asserting the right but on whether the expectation is reasonable in light of all the surrounding circumstances." *Commonwealth v. Viall*, 890 A.2d 419, 421 (Pa.Super. 2005) (citation omitted).

Generally, the Fourth Amendment requires that law officers obtain a warrant before they intrude into a place of privacy; however, an exception to the warrant requirement exists when the property seized has been abandoned. *Commonwealth v. Clark*, 746 A.2d 1128, 1133 (Pa.Super. 2000) (*en banc*). "[T]o prevail on a suppression motion, a defendant must demonstrate a legitimate expectation of privacy in the area searched or effects seized, and such expectation cannot be established where a defendant has meaningfully abdicated his control, ownership or possessory interest." *Commonwealth v. Dowds*, 563 Pa. 377, 761 A.2d 1125, 1131 (2000). Simply put, "no one has standing to complain of a search or seizure of property that he has voluntarily abandoned." *Commonwealth v. Shoatz*, 469 Pa. 545, 366 A.2d 1216, 1220 (1976).

Our Supreme Court has explained, "abandonment of a privacy interest is primarily a question of intent and may be inferred from words spoken, acts done, and other objective facts." *Dowds*, *supra*, 761 A.2d at 1131. "All relevant circumstances existing at the time of the alleged abandonment should be considered." *Shoatz*, *supra*, 366 A.2d at 1220. "The issue is not abandonment in the strict property-right sense, but whether the person prejudiced by the search had voluntarily discarded, left behind, or otherwise relinquished his interest in the property in question so that he could no longer retain a reasonable expectation of privacy with regard to it at the time of the search." *Id.*

*Kane*, 210 A.3d at 330-31.

- 14 -

In the case *sub judice*, assuming, *arguendo*, Appellant had a subjective expectation of privacy in his Samsung Galaxy SS, the trial court concluded that his expectation was not one that society was prepared to recognize as reasonable. Specifically, the trial court concluded that Appellant voluntarily left behind or otherwise relinquished his interest in the Samsung Galaxy SS, so he could no longer retain a reasonable expectation of privacy with regard to it at the time the police powered it up, called it, and determined the 4534 number belonged to the phone (which in turn confirmed Appellant's name as the account holder). **See** Trial Court Opinion, filed 11/30/18, at 10.

In this vein, the trial court found that Appellant left his cell phone inside the van, which was the scene of the murder. Even assuming, *arguendo*, Appellant did not know when he fled the scene that the cell phone was inside of the van, there is no evidence that Appellant returned to the scene, contacted the victim's family, or contacted the police to retrieve the cell phone. In fact, within an hour or two of the murder, Appellant changed his cell phone number in an apparent attempt to distance himself from the phone. **See id.** at 3. Accordingly, we agree with the trial court that the Commonwealth demonstrated that Appellant did not have a legitimate expectation of privacy in the Samsung Galaxy SS since he meaningfully abdicated his control, ownership, or possessory interest. **See Dowds**, **supra**.

We note that it makes sense Appellant would not want to alert the police to the fact that he was the owner of a piece of inculpatory evidence confiscated

with other items left in the van where the murder occurred. Revealing himself to authorities as the owner of the Samsung Galaxy S5 would potentially make him a suspect in the murder investigation, as well as open him up to too many questions. However, the lack of any evidence that Appellant attempted to retrieve the cell phone after he realized it had been left behind provides an obvious negative inference that Appellant chose not to retrieve it, and the circumstances surrounding the way in which the phone was found (*i.e.*, in the van that was part of the murder scene) provides a motive as to why. **See Commonwealth v. Elverton**, No 1183 WDA 2022, 311 A.3d 592 (Pa.Super. filed 12/18/23) (unpublished memorandum) (holding the appellant's decision to stop pursuing the phone, in the face of reasonable alternatives available to obtain the return of the phone, constituted abandonment).[6]

This Court analyzes the question of abandonment from the vantage point of a reasonable, law-abiding citizen, not from the vantage point of a person who committed a crime. **See Viall**, **supra**. The lack of any record that Appellant took steps to retrieve the phone, and then changed the number for the phone, circumstantially suggests that he had something to hide, as a reasonable law-abiding citizen whose phone was left in the van or otherwise in police custody would have no qualm with inquiring about the phone.

---

[6] We note that, pursuant to Pa.R.A.P. 126(b), unpublished non-precedential decisions of the Superior Court filed after May 1, 2019, may be cited for their persuasive value. We find **Elverton** to be persuasive.

Moreover, as the trial court concluded "the police did not cause [Appellant] to abandon his cell phone at the scene as [Appellant] was not present at the time of the investigation." Trial Court Opinion, filed 11/30/18, at 10. *See Commonwealth v. Byrd*, 987 A.2d 786 (Pa.Super. 2009) (holding that, while abandoned property may be obtained and used for evidentiary purposes, such property may not be utilized where the abandonment was coerced by unlawful police action).

Based on the totality of the circumstances and evidence offered during the suppression hearing,[7] we find no abuse of discretion. Based on Appellant's acts and other objective facts, we conclude the trial court did not err in holding Appellant voluntarily relinquished his interest in the Samsung Galaxy SS so that he could no longer retain a reasonable expectation of privacy with regard to it at the time the police powered it on and checked to see if the number dialed by the police belonged to the cell phone. To quote our Supreme Court, "no one has standing to complain of a search or seizure of property that he has voluntarily abandoned." *Shoatz*, *supra*, 366 A.2d at 1220. Thus, we affirm on this basis.[8]

For all of the foregoing reasons, we affirm.

_____

[7] To the extent Appellant requests that we consider evidence and testimony presented solely during his trial, we decline to do so. Our scope of review is limited to the record developed at the suppression hearing. *Rivera*, *supra*.

[8] In light of our discussion *supra*, we need not address Appellant's remaining theories seeking suppression of the Samsung Galaxy SS and its contents.

Judgment of Sentence affirmed.

Judge Kunselman joins.

Judge Olson concurs in the result.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

Date: 7//22/2024