604 A.2d 276

**COMMONWEALTH of Pennsylvania, Appellant,**

**v.**

**Garland J. BENNETT, Appellee.**

Superior Court of Pennsylvania.

Submitted Aug. 22, 1991.

Filed March 3, 1992.

604

Kemal A. Mericli, James R. Gilmore, Asst. Dist. Attys., Pittsburgh, for the Com., appellant.

Norma Chase, Pittsburgh, for appellee.

Before WIEAND, CIRILLO and JOHNSON, JJ.

WIEAND, Judge:

The Commonwealth appeals from an order of the trial court suppressing in excess of one hundred (100) grams of cocaine seized by police from a duffle bag carried by Garland J. Bennett upon arrival at the Greater Pittsburgh International Airport. The bag was seized after Bennett had placed it against a wall outside the main terminal. When confronted and questioned by police, Bennett denied ownership of it. The Commonwealth asserted at the suppression hearing that Bennett, by his denial of ownership, had abandoned any reasonable expectation of privacy which he would otherwise have had in the duffle bag. The suppression court determined, however, that Bennett's denial of ownership had been coerced and did not constitute a voluntary abandonment.[1] This appeal fol-

1. Specifically, the suppression court said it was of the opinion "that the denial by the Defendant of ownership of the duffle bag was prompted by the coercive action [of the police] and prompted by the

lowed.[2]

In reviewing an appeal taken by the Commonwealth from an order suppressing evidence,

> we must consider only the evidence of the defendant's witnesses and so much of the Commonwealth evidence that, read in the context of the record as a whole, remains uncontradicted. *See Commonwealth v. Hamlin,* 503 Pa. 210, 469 A.2d 137 (1983). Furthermore, our scope of appellate review is limited primarily to questions of law. *See Commonwealth v. White,* 358 Pa.Super. 120, 516 A.2d 1211 (1986). We are bound by the suppression court's findings of fact if those findings are supported by the record. *Id.* Factual findings wholly lacking in evidence, however, may be rejected. *Id.*

*Commonwealth v. Stine,* 372 Pa.Super. 312, 314, 539 A.2d 454, 455 (1988). See also: *Commonwealth v. Lagana,* 517 Pa. 371, 375–376, 537 A.2d 1351, 1353–1354 (1988); *Commonwealth v. James,* 506 Pa. 526, 532–533, 486 A.2d 376, 379 (1985). "We will also affirm the decision of the suppression court 'if it can be sustained for any reason whatsoever, even if the [suppression] court offered an erroneous reason to support its action.' " *Commonwealth v. Bowers,* 400 Pa.Super. 377, 381, 583 A.2d 1165, 1167 (1990), quoting *Commonwealth v. Reidenbaugh,* 282 Pa.Super. 300, 309–310, 422 A.2d 1126, 1131 (1980). See also: *Commonwealth v. Shaw,* 494 Pa. 364, 368 n. 1, 431 A.2d 897, 899 n. 1 (1981); *Commonwealth v. Nelson,* 320 Pa.Super. 488, 493, 467 A.2d 638, 641 (1983).

The suppression court has briefly described the factual scenario giving rise to the legal issues in this appeal as follows:

> Defendant's fear. Based on the totality of the circumstances, the result is a 'coerced lie.' "

**2.** The Commonwealth may appeal from a trial court's order suppressing evidence when it certifies in good faith that the suppression order will terminate or substantially handicap its prosecution of the case. See: *Commonwealth v. Dugger,* 506 Pa. 537, 486 A.2d 382 (1985). Instantly, the Commonwealth has fulfilled this requirement, and, as such, its appeal is properly before this Court.

On [July 17, 1989], the Defendant, at Greater Pittsburgh International Airport, deplaned from Flight 597 from New York City and became the focus of an investigation pursuant to a drug courier profile utilized by the Allegheny County Police [Drug] Interdiction Team. Defendant was followed through the concourse to the outside of the airport terminal, observed carrying a green duffle bag throughout the pertinent time period, including a rest room stop.

While waiting for a bus outside the airport terminal, testimony at the Suppression Hearing indicated that the Defendant placed the duffle bag against the wall and walked from 6 to 15 feet away from the duffle bag but remained within a 15 foot radius of the bag. It was at this point that two Allegheny County police officers confronted the Defendant and inquired into several of the aspects which were itemized on the Drug Courier Profile: air line ticket, lack of baggage, identification, destination. When asked if the duffle bag leaning against the wall belonged to Defendant, Defendant answered in the negative. The officer testified that he immediately went to the duffle bag, opened it, examined the contents and discovered the suspected controlled substance. Defendant was then placed under arrest.

In light of the suppression court's determination in this case, the essential issues to be resolved on appeal are: (1) whether appellee's denial of ownership of the duffle bag was sufficient to constitute an abandonment of a possessory interest therein; and (2) if, in fact, an abandonment of the duffle bag occurred, was it coerced by unlawful police conduct.

"It is axiomatic that a defendant has no standing to contest the search or seizure of items which he has voluntarily abandoned." *Commonwealth v. Windell*, 365 Pa.Super. 392, 398, 529 A.2d 1115, 1117 (1987). See also: *Commonwealth v. Rodriguez*, 385 Pa.Super. 1, 4, 559 A.2d 947, 948 (1989); *Commonwealth v. Cihylik*, 337 Pa.Super. 221, 228, 486 A.2d 987, 990 (1985). The applicable law with

respect to the issue of abandonment has been stated by the Superior Court as follows:

It is hornbook law that abandoned property may be obtained and used for evidentiary purposes without regard to the existence of probable cause or a search warrant. *Commonwealth v. Williams,* 269 Pa.Super. 544, 410 A.2d 835 (1979). The theory of abandonment is predicated upon the clear intent of an individual to relinquish control of the property he possessed. *Commonwealth v. Shoatz,* 469 Pa. 545, 366 A.2d 1216 (1976). Personal belongings, such as [a] suitcase, "retain their constitutional protection until their owner meaningfully abdicates control or responsibility." *Commonwealth v. Platou,* 455 Pa. 258, 312 A.2d 29 (1973), *cert. denied,* 417 U.S. 976, 94 S.Ct. 3183, 41 L.Ed.2d 1146 (1974). The issue is not abandonment in the strict property right sense, but whether the person prejudiced by the search had voluntarily discarded, left behind, or otherwise relinquished his interest in the property in question so that he could no longer retain a reasonable expectation of privacy with regard to it at the time of the search. *Commonwealth v. Shoatz, supra* [469 Pa.] at 553, 366 A.2d at 1220 *citing U.S. v. Colbert,* 474 F.2d 174, 176 (5th Cir.1973). Although abandoned property is admissible evidence, such property may not be utilized where the abandonment is coerced by unlawful police action. *Commonwealth v. Harris,* 491 Pa. 402, 421 A.2d 199 (1980); *Commonwealth v. Jeffries,* 454 Pa. 320, 311 A.2d 914 (1973); *Commonwealth v. Pollard,* 450 Pa. 138, 299 A.2d 233 (1973).

*Commonwealth v. Vecchione,* 327 Pa.Super. 548, 557–558, 476 A.2d 403, 408 (1984). See also: *Commonwealth v. Williams,* 380 Pa.Super. 227, 231–232, 551 A.2d 313, 315 (1988); *Commonwealth v. Bulling,* 331 Pa.Super. 84, 103–104, 480 A.2d 254, 264 (1984); *Commonwealth v. Williams,* 269 Pa.Super. 544, 547, 410 A.2d 835, 836 (1979).

The Pennsylvania Supreme Court has observed also that:

'Abandonment is primarily a question of intent, and intent may be inferred from words spoken, acts done, and other objective facts. *United States v. Cowan*, 2d Cir. 1968, 396 F.2d 83, 87. All relevant circumstances existing at the time of the alleged abandonment should be considered. *United States v. Manning*, 5th Cir.1971, 440 F.2d 1105, 1111. Police pursuit or the existence of a police investigation does not of itself render abandonment involuntary. See *Abel v. United States, supra* [362 U.S. 217, 80 S.Ct. 683, 4 L.Ed.2d 668 (1960)]; *United States v. Edwards*, 5th Cir.1971, 441 F.2d 749; *Lurie v. Oberhauser*, 9th Cir.1970, 431 F.2d 330.'

*Commonwealth v. Shoatz*, 469 Pa. 545, 553, 366 A.2d 1216, 1220 (1976), quoting *United States v. Colbert*, 474 F.2d 174, 176 (5th Cir.1973) (en banc). See also: *Commonwealth v. Anderl*, 329 Pa.Super. 69, 82, 477 A.2d 1356, 1362 (1984).

The Commonwealth argues that the decision of the Superior Court in *Commonwealth v. Anderl, supra*, is controlling of the abandonment issue in this case. In *Anderl*, the defendant, who had been involved in an automobile accident, removed a satchel from the trunk of his car and concealed it behind a hedge on the property of a third person. When the satchel was found by a police officer, the defendant responded to the officer's inquiry by denying that the satchel belonged to him. The Superior Court held that, under these circumstances, the defendant had abandoned any reasonable expectation of privacy in the satchel. In so holding, however, the *Anderl* Court specifically noted that the defendant's expectation of privacy in the contents of the satchel had been "measurably decreased by his action of hiding it on the property on an unknown third party." *Id.*, 329 Pa.Superior Ct. at 84, 477 A.2d at 1363. Thus, the Court did not consider whether the subsequent denial of ownership would alone have been determinative. In the instant case, the defendant's prior conduct did not evidence a clear intent to relinquish his expectation of privacy in the duffle bag, for he merely had placed the bag against the terminal wall while waiting for a bus and at all times

remained within a 6 to 15 foot radius of the bag. The issue clearly presented in this case, therefore, is whether defendant's denial of ownership of the duffle bag, standing alone, was sufficient to constitute an abandonment.

■ Although our research has disclosed no appellate decisions in this Commonwealth which are directly on point, we are guided by federal appellate court decisions which have held generally that abandonment may be found where, in response to police questioning, a defendant denies ownership of the property in question. See: *United States v. Carrasquillo*, 877 F.2d 73 (D.C.Cir.1989) (where train passenger denied ownership of garment bag under his feet and no other person claimed it, bag was legally abandoned and could be searched without warrant); *United States v. McBean*, 861 F.2d 1570 (11th Cir.1988) (defendant had no reasonable expectation of privacy in luggage in trunk of his car where he told police that it was not his luggage and that he knew nothing of its contents); *United States v. Roman*, 849 F.2d 920 (5th Cir.1988) (defendant abandoned suitcases which he had checked at airport, where he told agents that he had not checked any luggage and had no baggage other than his carryon bag). See also: *United States v. Clark*, 891 F.2d 501 (4th Cir.1989); *United States v. Moskowitz*, 883 F.2d 1142 (2d Cir.1989); *United States v. Nordling*, 804 F.2d 1466 (9th Cir.1986); *United States v. Lucci*, 758 F.2d 153 (6th Cir.1985), *cert. denied*, 474 U.S. 843, 106 S.Ct. 129, 88 L.Ed.2d 106 (1985); *United States v. Miller*, 589 F.2d 1117 (1st Cir.1978), *cert. denied*, 440 U.S. 958, 99 S.Ct. 1499, 59 L.Ed.2d 771 (1979).

The leading decision on abandonment by disclaimer of ownership, according to LaFave,[3] is *United States v. Colbert, supra.* In *Colbert*, police officers had approached two men who were walking along a street in Birmingham, Alabama. The reason given was that one of the men resembled a wanted felon. Upon seeing the police, the two men set the briefcases which they had been carrying on the sidewalk. In response to a police inquiry, the two men

3. 1 W. LaFave, Search and Seizure, § 2.6(b), at 469 (2d Ed.1987).

claimed they were book salesmen. However, they denied ownership of the briefcases which they had been carrying. After being frisked by police, the two men began walking away from the officers, leaving the briefcases behind. A subsequent warrantless search of the briefcases led to the discovery of illegal firearms which had been concealed therein. In holding that the two men lacked standing to contest the search of the briefcases, the Fifth Circuit, sitting en banc, reasoned as follows:

> The facts of this case show conclusively that Colbert and Reese abandoned their briefcases before the searches took place. In response to police questions they both disclaimed any interest in the briefcases and began to walk away from them. The police officers in no way compelled these actions. Under these circumstances appellants could entertain no reasonable expectation of privacy in them. Compare *Lurie v. Oberhauser*, [431 F.2d 330 (9th Cir.1970),] where a disclaimer of any ownership or possessory interest in a suitcase in the course of a police investigation was held sufficient without more to support a finding of abandonment. The legal effect of the abandonment is, as noted above, to deprive appellants of standing to challenge the subsequent searches.

*United States v. Colbert, supra,* 474 F.2d at 177. See also: *United States v. Garcia,* 849 F.2d 917 (5th Cir.1988); *United States v. McKennon,* 814 F.2d 1539 (11th Cir.1987); *United States v. Tolbert,* 692 F.2d 1041 (6th Cir.1982), *cert. denied,* 464 U.S. 933, 104 S.Ct. 337, 78 L.Ed.2d 306 (1983); *United States v. Hawkins,* 681 F.2d 1343 (11th Cir.1982), *cert. denied,* 459 U.S. 994, 103 S.Ct. 354, 74 L.Ed.2d 391 (1982); *United States v. Canady,* 615 F.2d 694 (5th Cir. 1980), *cert. denied,* 449 U.S. 862, 101 S.Ct. 165, 66 L.Ed.2d 78 (1980). See generally: Annot., Search and Seizure: What Constitutes Abandonment of Personal Property Within Rule that Search and Seizure of Abandoned Property Is Not Unreasonable—Modern Cases, 40 A.L.R.4th 381, §§ 21–25 (1985 and 1991 Supplement).

After careful review of these federal decisions, we conclude that their rationale is persuasive. We hold, therefore, that under the circumstances present in this case, defendant's disclaimer of ownership constituted an abandonment of the duffle bag which he had previously been carrying. Our finding that appellee abandoned the duffle bag, however, does not end our inquiry for, "[a]lthough abandoned property may normally be obtained and used for evidentiary purposes by the police, such property may not be utilized where the abandonment is coerced by unlawful police action." *Commonwealth v. Pollard,* 450 Pa. 138, 143, 299 A.2d 233, 236 (1973) (footnote omitted). See also: *Commonwealth v. Shoatz, supra* 469 Pa. at 553–554, 366 A.2d at 1220; *Commonwealth v. Jeffries,* 454 Pa. 320, 326, 311 A.2d 914, 918 (1973). Accordingly, we must proceed to determine further whether appellee's abandonment of the duffle bag was coerced by unlawful police conduct.

To determine the lawfulness of the police conduct in the instant case, it is necessary to establish the nature of the contact which occurred between the police and appellee prior to appellee's abandonment of the duffle bag. The types of contacts which occur between police and citizens were characterized by the Superior Court in *Commonwealth v. Brown,* 388 Pa.Super. 187, 565 A.2d 177 (1989), in the following manner:

> Encounters between the public and the police that do not involve a formal arrest may be categorized as mere encounters, non-custodial detentions, and custodial detentions. *Commonwealth v. Ellis,* 379 Pa.Super. 337, 353, 549 A.2d 1323, 1331 (1988). The term "mere encounter" refers to certain non-coercive interactions with the police that do not rise to the level of a seizure of the person under the fourth amendment. For example, a "mere encounter" occurs if the police simply approach a person on a public street in order to make inquiries. *See Commonwealth v. Hall,* 475 Pa. 482, 488, 380 A.2d 1238, 1241 (1977).

On the other hand, both non-custodial detentions and custodial detentions are seizures of the person that trigger fourth amendment protection. *See Dunaway v. New York,* 442 U.S. 200, 207–211, 99 S.Ct. 2248, 2253–2256, 60 L.Ed.2d 824 (1979); *see generally* 2 LaFave, **Search and Seizure** § 5.1 (2d ed. 1987) and 3 LaFave, **Search and Seizure,** §§ 9.1–9.6 (2d ed. 1987). A non-custodial detention or "forcible stop" occurs when a police officer temporarily detains an individual by means of physical force or a show of authority for investigative purposes. *See Commonwealth v. Williams,* 287 Pa.Super. 19, 22, 429 A.2d 698, 700 (1981). In order to justify a forcible stop under the fourth amendment, the police must point to specific and articulable facts that, taken together with the rational inferences from those facts, reasonably indicate that criminal activity may be afoot. *See Terry v. Ohio,* 392 U.S. 1, 20, 88 S.Ct. 1868, 1879, 20 L.Ed.2d 889 (1968). Custodial detention is a more severe form of government intrusion in which the conditions or duration of the police detention approximate the level of restraint associated with a formal arrest. *See Ellis,* 379 Pa.Super. at 356, 549 A.2d at 1332. In order to justify custodial detention, the police must have probable cause to believe that an offense has been or is being committed. *Dunaway v. New York,* 442 U.S. at 216, 99 S.Ct. at 2258.

*Id.,* 388 Pa.Superior Ct. at 189–190, 565 A.2d at 178–179. See also: *Commonwealth v. Lidge,* 399 Pa.Super. 360, 366–367, 582 A.2d 383, 386 (1990); *Commonwealth v. Douglass,* 372 Pa.Super. 227, 238–239, 539 A.2d 412, 417–418 (1988).

■ Instantly, the Commonwealth asserts that the testimony of the police officers, who approached and questioned appellee, established the occurrence of a "mere encounter", pursuant to which appellee was not subjected to seizure within the meaning of the Fourth Amendment. Unfortunately, the suppression court's findings are inadequate and its conclusions not always consistent. Nevertheless, our standard of review does not change. Where there are not explicit findings, or in the case of lacunae among the

findings, we consider, where, as here, the suppression court has entered an order suppressing Commonwealth evidence, only the evidence of the defendant and so much of the evidence of the Commonwealth as remains uncontradicted. Cf. *Commonwealth v. Hughes*, 521 Pa. 423, 439, 555 A.2d 1264, 1272 (1989); *Commonwealth v. Willis*, 483 Pa. 21, 26, 394 A.2d 519, 521 (1978); *Commonwealth v. Sparrow*, 471 Pa. 490, 498 n. 5, 370 A.2d 712, 716 n. 5 (1977), *overruled on other grounds in Commonwealth v. Tarver*, 493 Pa. 320, 426 A.2d 569 (1981).

At the suppression hearing, defendant described his encounter with the police in the following manner:

Q. Would you tell us what happened when you went outside the airport?

A. I went outside to the cab stand and asked the cab driver how much it would be to go in to town and it was too much, I didn't have enough. I said, "That's okay, I'll just get the bus."

Q. Speak a little slower and pull the mike up to you so we can hear you?

A. I said I went to over to the bus station to wait for the bus, the bus terminal part.

Q. Okay.

A. So then—

Q. What did you do with the green duffle bag?

A. I set it down by the sliding glass doors.

Q. Okay.

A. I walked over by the curb waiting for the bus.

Q. Where would the distance be from where you set it down to the curb?

A. Like from here over by that wall (indicating). Then I was waiting there, then the guy just went out the room and the other guy, the other officer—

Q. That was Officer Abbot?

A. They came up to me, so, he said, "Excuse me, can we talk to you for a minute?" I, like, backed up, like this, you know, like, (indicating) what's going on?

Q. Were they in uniforms?

A. No.

Q. Okay.

A. Plain clothes.

Q. Okay.

A. When I was backing up, he grabbed this arm like this (indicating.)

Q. Who grabbed your arm?

A. The one that just went out.

Q. Officer Abbot?

A. Yeah.

Q. Show me how he took your arm, if I'm you, you be Officer Abbot.

A. Like when they first came up to me, they were both on me, like, right up against me, both sides of me, I, like—

Q. Indicating their shoulders were touching your shoulders?

A. Yeah, he came on this side of me, Excuse me, we'd like to talk to you for a minute. I broke away, they were on both sides, like this, like that, I said, "What's the problem, what you all want to talk to me for?" He did like this (indicating), he said, We police officers, then they showed identification.

Q. After he said, We're police officers, he took your arm?

A. Uh-hum.

Q. Then what did he do?

A. He said, "Can you step away from the curb, come up over here," took me to the sidewalk, like, taking me along, the other one was right on the side of me.

Q. How much did he usher you?

A. Like from here to about where that little cassette is on that table.

A. Estimating approximately six feet?

A. (The witness nodded in the affirmative.)

Q. Okay. Tell me what happened, then, what did they say to you?

A. He started questioning, he said, you know, where was I coming from? I said, "New York." He said, "What airport?" I said, "LaGuardia." Then he asked me to see my plane ticket, so I showed him my plane ticket, he gave it right back.

Q. Was there a uniform officer on at this point?

A. He started walking across the street, by the time they asked me that stuff, he was in front of me and they was both on the side of me. So then—

Q. Was the one officer still holding your arm?

A. He was, like, yeah, like, he was making sure I couldn't run away or nothing like that.

Q. Okay.

A. So then he asked me—he was saying something about something about, you know, the New York City and all that stuff, then he said, "We're interested in looking in your bag," I said, "What bag?" He said, "That bag over there," I said, "That's not my bag."

Q. That was your bag?

A. Yes.

Q. You lied to them?

A. Yeah.

Q. Did you feel when they approached you—from the time they approached you during the entire time they were with you that you were free to leave?

A. No, feel like I was arrested already.[4]

"[A]ny assessment of whether police conduct amounts to a seizure implicating the Fourth Amendment must take into consideration all of the circumstances surrounding the incident in each individual case." *Commonwealth v. Lidge,*

---

**4.** Appellee's testimony was in contrast to that of Officers Kaminski and Abbot, who testified that they had approached appellee in a non-threatening manner, did not touch him or restrict his movement in any way; told him that he did not have to talk with them and could leave, if he wanted; and finally, upon obtaining appellee's agreement to answer questions, questioned him in a normal, conversational tone of voice.

*supra* at 366, 582 A.2d at 386. See also: *Commonwealth v. Jones*, 474 Pa. 364, 371, 378 A.2d 835, 838–839 (1977), *cert. denied*, 435 U.S. 947, 98 S.Ct. 1533, 55 L.Ed.2d 546 (1978); *Commonwealth v. Williams*, 287 Pa.Super. 19, 24, 429 A.2d 698, 701 (1981). In this regard the United States Supreme Court has concluded that:

a person has been "seized" within the meaning of the Fourth Amendment only if, in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave. Examples of circumstances that might indicate a seizure, even where the person did not attempt to leave, would be the threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person of the citizen, or the use of language or tone of voice indicating that compliance with the officer's request might be compelled. See *Terry v. Ohio*, supra [392 U.S.], at 19, n 16, 20 LEd2d 889, 88 SCt 1868 [at 1879, n. 16], 44 Ohio Ops 2d 383; *Dunaway v. New York*, 442 US 200, 207, and n. 6, 60 LEd2d 824, 99 SCt 2248 [2253, and n. 6]; 3 W. LaFave, Search and Seizure 53–55 (1978). In the absence of some such evidence, otherwise inoffensive contact between a member of the public and the police cannot, as a matter of law, amount to a seizure of that person.

*United States v. Mendenhall*, 446 U.S. 544, 554–555, 100 S.Ct. 1870, 1877, 64 L.Ed.2d 497, 509–510 (1980) (Opinion Announcing Judgment of the Court per Stuart, J.) (footnote omitted). See also: *Michigan v. Chesternut*, 486 U.S. 567, 573–574, 108 S.Ct. 1975, 1979–1980, 100 L.Ed.2d 565, 571–572 (1988); *INS v. Delgado*, 466 U.S. 210, 215–217, 104 S.Ct. 1758, 1762–1763, 80 L.Ed.2d 247, 254–255 (1984). It has been observed further that:

an encounter becomes a seizure if the officer engages in conduct which a reasonable man would view as threatening or offensive even if performed by another private citizen. This would include such tactics as pursuing a person who has attempted to terminate the contact by

departing, calling to such a person to halt, holding a person's identification papers or other property, blocking the path of the suspect, and encircling the suspect by many officers, in addition to the more obvious ones. 3 W. LaFave, Search and Seizure, § 9.2(h) at pp. 413–414 (2d ed. 1987) (footnotes omitted). See also: *In the Interest of Jermaine*, 399 Pa.Super. 503, 511–512, 582 A.2d 1058, 1062 (1990).

■ Here, the defendant's testimony which we are bound to accept in the absence of specific findings to the contrary, reveals that prior to questioning him, Kaminski and Abbot approached him, flanking him on both sides. Abbot then grabbed appellee's arm and ushered him about six feet from the curb to the sidewalk. During initial questioning, a uniformed officer also approached and stationed himself in front of appellee, further blocking his path. Under these circumstances, we are constrained to reject the Commonwealth's assertion that the confrontation between appellee and the police was a "mere encounter" which did not implicate appellee's Fourth Amendment rights. Rather, on the record before this Court, we are forced to conclude that Officers Kaminski and Abbot forcibly detained appellee because of their suspicion that he was a courier of illegal drugs. To effect a forcible detention, the officers were required to possess reasonable and articulable suspicion that appellee was committing a crime. If reasonable suspicion was lacking, defendant's abandonment of the duffle bag in response to police questioning would have flowed from coercive and improper police conduct. Therefore, we must determine whether Officers Kaminski and Abbot were in possession of sufficient facts and circumstances to justify their forcibly detaining defendant for questioning pursuant to the standard established in *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968).

■ At the suppression hearing, the uncontradicted testimony of Kaminski and Abbot established that Bennett was first observed getting off a flight from New York City, known as a source city for illegal narcotics. He was

dressed casually in sweat clothes and a baseball cap, while most of the other passengers were dressed in business suits. The officers first began to focus on defendant when he made two brief phone calls shortly after disembarking from the airplane and behaved in an animated manner during these conversations. The officers observed further that defendant appeared to be keeping very tight control over the duffle bag which he was carrying, even when he went into a men's room. Their suspicions grew when defendant passed the baggage claim area without claiming any luggage. This prompted the officers to follow defendant as he exited the terminal and approached a cab driver. After briefly talking to the cab driver, defendant walked over to a bus stop. Kaminski and Abbot then questioned the cab driver, who told them that defendant had inquired about the fare to downtown Pittsburgh and had said he could not afford it. The officers then noticed defendant looking in their direction, and, subsequently, walking over to the terminal wall and putting down the duffle bag which he had been carrying. At this point, Kaminski and Abbot approached appellee to investigate further.

■ In conducting their surveillance of appellee, Kaminski and Abbot had been using a drug courier profile. Among the characteristics listed on the profile, Kaminski and Abbot identified the following factors which had led them to focus upon appellee and ultimately to approach him: (1) his arrival from a source city for illegal drugs; (2) his casual manner of dress; (3) his making of brief, animated telephone calls; (4) his not having any checked baggage; and (5) his carrying of only a single item of carry on luggage.[5]

5. As a result of their questioning of appellee, the police later learned that appellee was traveling pursuant to an one-way ticket which had been paid for in cash; that he had no identification; that the name on his airline ticket did not match the name stenciled on the duffle bag he was carrying; and that he said that he would be returning to New York the next day, but had no return reservations. However, these facts are not relevant to establish reasonable suspicion for the police stop, for defendant had been forcibly detained before the questioning began.

The fact that the officers were relying upon a drug courier profile is not determinative. "[A] match between the so-called profile and characteristics exhibited by a defendant does not, in and of itself, create a reasonable suspicion sufficient to justify an investigatory stop." *United States v. Hanson*, 801 F.2d 757, 762 (5th Cir.1986), citing *United States v. Berry*, 670 F.2d 583, 600 (5th Cir.1982) (en banc). However, while the characteristics listed in a drug courier profile "do not necessarily establish reasonable suspicion or probable cause in any given case, profiles are clearly a lawful starting point for police investigations." *United States v. Carrasquillo, supra*, 877 F.2d at 76. Moreover, "[i]nclusion of some of those characteristics within the 'informally compiled' drug courier profile does not mean that they cannot be considered significant when properly evaluated." *United States v. Sanford*, 658 F.2d 342, 346 (5th Cir.1981). In the final analysis, "[a] court sitting to determine the existence of reasonable suspicion must require the agent to articulate the factors leading to that conclusion, but the fact that these factors may be set forth in a 'profile' does not somehow detract from their evidentiary significance as seen by a trained agent." *United States v. Sokolow*, 490 U.S. 1, 10, 109 S.Ct. 1581, 1587, 104 L.Ed.2d 1, 12 (1989).[6]

**6.** With respect to the use of drug courier profiles, the Superior court has recently made the following observations:

The drug courier profile is not a "national profile." Profiles vary from city to city, airport to airport, and also depending on which law enforcement agency is using them. The profile is subject to racial abuse and gender stereotyping, where the fact that a person is an African–American, Columbian, or Hispanic has appeared as a profile characteristic, as has the fact that the person was the only woman on an airplane carrying business travelers. *Commonwealth v. Lidge*, [399] Pa.Super. [360], 582 A.2d 383 (1990). A breakdown of profile traits listed in the reported decisions reveals that it encompasses such contradictory characteristics as deplaning first and deplaning last, paying with small bills and paying with large bills. It also encompasses an extraordinary amount of innocent behavior such that the average airline traveler would be hard-pressed to not display at some time during a trip. Furthermore, it is not clear whether the display of one or two characteristics is sufficient to fit the profile, or whether if some characteristics carry greater weight than other characteristics such that the display of

The factors which led Officers Kaminski and Abbot to suspect appellee of transporting drugs included his arrival from a source city, his casual manner of dress on a business flight, his keeping tight control over the duffle bag he was carrying, and the absence of any checked luggage. The Commonwealth additionally points to appellee's intended use of public transportation and his glancing back and forth at the officers as factors arousing police suspicion. After careful study, however, we are constrained to hold that these factors were insufficient to justify a forcible investigatory stop.

In *Reid v. Georgia*, 448 U.S. 438, 100 S.Ct. 2752, 65 L.Ed.2d 890 (1980), the Supreme Court held that a defendant's arrival from a source city for cocaine in the early morning when law enforcement activities were diminished, the apparent attempt by defendant and his companion to hide the fact that they were traveling together, and the absence of luggage other than shoulder bags was insufficient to establish reasonable suspicion to justify a *Terry* stop. The Court reasoned as follow:

We conclude that the agent could not, as a matter of law, have reasonably suspected the petitioner of criminal activity on the basis of these observed circumstances. Of the evidence relied on, only the fact that the petitioner preceded another person and occasionally looked backward at him as they proceeded through the concourse relates to their particular conduct. The other circumstances describe a very large category of presumably innocent travelers, who would be subject to virtually random seizures were the Court to conclude that as little foundation as there was in this case could justify a seizure. Nor can we agree, on this record, that the manner in which the petitioner and his companion walked through the airport reasonably could have led the agent

one of these weightier characteristics may trigger an airport stop. Note, The Drug Courier Profile and Airport Stops: Reasonable Intrusions or Suspicionless Seizures? 12 *Nova.L.Rev.* 273, 288–296. *Commonwealth v. Daniels,* 410 Pa.Super. 275, 279 n. 1, 599 A.2d 988, 990 n. 1 (1991).

to suspect them of wrongdoing. Although there could, of course, be circumstances in which wholly lawful conduct might justify the suspicion that criminal activity was afoot, see *Terry v. Ohio,* supra [392 U.S.] at 27–28, 20 LEd2d 889, 88 SCt 1868 [at 1883], 44 Ohio Ops 3d 383, this is not such a case. The agent's belief that the petitioner and his companion were attempting to conceal the fact that they were traveling together, a belief that was more an "inchoate and unparticularized suspicion or 'hunch,' " 392 US, at 27, 20 LEd2d 889, 88 SCt 1868 [at 1883], 44 Ohio Ops 2d 383, than a fair inference in the light of his experience, is simply too slender a reed to support the seizure in this case.

*Reid v. Georgia, supra* at 441, 100 S.Ct. at 2754, 65 L.Ed.2d at 894.

We find additional support for our conclusion that Kaminski and Abbot lacked reasonable suspicion to forcibly detain appellee for questioning in the decision of the Fourth Circuit in *United States v. Gooding,* 695 F.2d 78 (4th Cir.1982), where, based upon facts similar to those in the instant case, reasonable suspicion was also found to be lacking. Specifically, the *Gooding* Court held that the following factors did not establish reasonable suspicion for an investigative *Terry* stop:

1) Gooding arrived from New York, a source city for drugs; 2) he was dressed casually on a 3:00 p.m. businessmen's flight; 3) he made a telephone call immediately after arriving and subsequently made two other phone calls; 4) he scanned the concourse after deplaning; 5) he acknowledged the agents' presence in an alleged cat-and-mouse game of mutual surveillance, and 6) to two of the agents his demeanor appeared "distraught" and "nervous."

*Id.,* 695 F.2d at 83. In support of its holding the Court reasoned as follows:

We begin by observing that though some of these factors appear in many of the general "drug courier profiles" in current use, the government concedes that

most profiles contain additional elements not present here. In any event, we have specifically held that a drug courier profile, without more, does not create a reasonable and articulable suspicion. *United States v. Harrison*, 667 F.2d 1158, 1161 (4th Cir.1982); see *Reid v. Georgia*, 448 U.S. at 440–41, 100 S.Ct. at 2753–54.

The overall weakness of these factors in generating a reasonable suspicion of individual wrongdoing—independent of any force derived from their use in demonstrably helpful law enforcement "profiles"—is obvious upon reflection. The first four, separately or in combination would include such a number of presumably innocent persons as to approach a subjectively administered, random basis for stopping and interrogating passengers coming into Washington National Airport. Seizures on any such random basis are of course one of the precise evils at which the fourth amendment was aimed. *Delaware v. Prouse*, 440 U.S. 648, 99 S.Ct. 1391, 59 L.Ed.2d 660 (1979); cf. *United States v. Martinez–Fuerte*, 428 U.S. 543, 96 S.Ct. 3074, 49 L.Ed.2d 1116 (1976). For this reason, we have held that such general characteristics cannot alone be relied upon to support a reasonable suspicion of individualized criminal activity. *United States v. Corbin*, 662 F.2d 1066, 1069 (4th Cir.1981).

In an attempt to bolster the objective criteria here relied upon, the government suggested at oral argument, citing our decision in *Corbin*, that Gooding engaged the police in a "cat and mouse" pattern of mutual surveillance. In *Corbin*, the agents described in detail how the defendants continually scanned the boarding gate and baggage claim area to determine whether they were under surveillance, and even approached an agent ostensibly asking for change. Nothing remotely approaching this suspicious pattern of activity occurred here. After combing the record, all we can find even remotely suggestive of such a pattern is that Gooding scanned the concourse as he debarked the plane, and that the agents, in the course of following him over some thirty minutes,

crossed paths with him on three occasions. This is simply not suspicious activity of the kind present in *Corbin.*

The final element relied upon is the agents' perception and description of Gooding's demeanor. Detective Bradley thought that Gooding looked "nervous, suspicious" as he got off the plane and Agent McCracken described Gooding as "distraught" when he received no answer to his first telephone call. The agents testified to nothing suspicious in his demeanor after these initial moments, and we find it significant that detective Isaac specifically testified that he never saw Gooding acting or looking about in a nervous fashion. In *Corbin,* we attached little weight to the fact that the suspects appeared nervous when they arrived in the airport. 662 F.2d at 1068–69. Although in some contexts nervous or anxious demeanor may obviously be relevant, see, e.g., *United States v. Elmore,* 595 F.2d 1036 (5th Cir.1979), the police officers' articulated and conflicting perceptions of Gooding's demeanor here are simply not of that order.

Though the constitutional requirement of a "reasonable articulable suspicion" for police investigative seizures has come justifiably to be a lenient one in the context of this type case, see *United States v. Buenaventura–Ariza,* 615 F.2d [29] at 35 [2nd Cir.1980], it nevertheless protects a precious right-hard earned and easily lost-to be free of arbitrary police intrusions on individual privacy and free movement. There is a line, dim though it be, and we are satisfied that here it was crossed. *See id.* at 37. On the objective criteria articulated by the police for the detention of this citizen, we conclude that his seizure was impermissible under the fourth amendment.

*United States v. Gooding, supra* at 83–84.

As was true in *Reid* and *Gooding,* the instant defendant's conduct was of a general nature and could very well have been found in a large number of wholly innocent passengers. The only non-general conduct proffered by the Commonwealth was appellee's looking back and forth at Kaminski and Abbot and then placing his duffle bag against the

terminal wall. At the suppression hearing, interestingly, neither Kaminski nor Abbot referred to this action by the defendant as being one of the factors which had led them to approach appellee for questioning. Neither Kaminski nor Abbot said that he thought the defendant appeared particularly nervous or that he appeared to suspect the presence of police officers. Under these circumstances, we are constrained to conclude that Kaminski and Abbot simply did not possess reasonable suspicion sufficient to detain appellee forcibly for investigative questioning.

Because appellee's abandonment of the duffle bag which he was carrying was preceded by and resulted from an unlawful *Terry* stop initiated by the police, we conclude that the cocaine found in the subsequent search of the duffle bag was properly suppressed by the trial court.

Order affirmed.

JOHNSON, J., files a dissenting opinion.

JOHNSON, Judge, dissenting.

I agree with my colleagues on the Majority Opinion that the order granting the motion to suppress the evidence should be affirmed. However, my colleagues go much further than the trial court. They conclude that the mere verbal denial of ownership constitutes an abandonment of the duffel bag Garland J. Bennett was observed carrying. I believe this is an inappropriate extension of the law of abandonment as I understand it. Accordingly, I must dissent.

The very experienced trial judge, the Honorable Walter R. Little, correctly observed, citing to 1 W. LaFave, Search and Seizure, § 2.6(b), at 467 (2d ed. 1987):

[T]he fundamental question is whether the relinquishment occurred under circumstances which indicate the defendant retained no justified expectation of privacy in the object.

In his Opinion filed pursuant to Pa.R.A.P. 1925, Judge Little sets forth the following facts, all of which are supported in the record:

Officer Dan Kaminski offered uncontroverted testimony that he observed the Defendant initially carrying the duffel bag at issue, entering and leaving a public bathroom while retaining possession of the bag, observed the Defendant make two telephone calls while holding the duffel bag, and eventually carry the duffel bag outside the airport terminal to await a bus to Pittsburgh. Officer Kaminski further testified that the only two periods when the duffel bag was not being held by the Defendant were when the Defendant was in the bathroom, at which time the duffel bag was between his feet on the floor, and when the Defendant placed the duffel bag up against the wall at the bus stop. *The only indication that Officer Kaminski had that the duffel bag containing the drugs did not belong to Defendant was when Defendant replied negatively to Officer Kaminski's question as to whether or not the bag belonged to Defendant, which was after the police had explained their purpose of being in the airport.* Defendant later testified that he lied to Officer Kaminski.

When Officer Kaminski was told that the bag did not belong to Defendant, he immediately proceeded to the duffel bag and began to examine its contents. This occurred after Officer Kaminski testified that he observed the Defendant, throughout the entire period of observation, to have the bag either on his shoulders or between his legs, and after the officers had identified themselves and told the Defendant of their purpose of being in the airport—drug investigations.

Opinion, Little, J., filed September 28, 1990, pages 5–6. (Citations to Suppression Hearing Transcript omitted; emphasis added).

From these facts, Judge Little concluded, and I wholeheartedly agree, that:

.... having viewed Defendant with the duffel bag for a preceding period of time, the officer cannot be reasonably expected to say that he considered the property abandoned on the mere assertion of the Defendant that it was not his property.

*Id.*, at page 10.

The Majority cites to many federal decisions to support its conclusion that disclaimer of ownership may, standing by itself, constitute abandonment. I do not find any of those federal cases going that far. Like Judge Little, the Majority looks also to Warren LaFave for guidance, but reads the roadsigns differently. I need not dispute that *United States v. Colbert*, 474 F.2d 174 (5th Cir.1973) is the leading case on abandonment by disclaimer of ownership. However, the *Colbert* court held that abandonment is primarily a question of *intent*, and that maxim has been followed by our courts here in Pennsylvania. *Commonwealth v. Shoatz*, 469 Pa. 545, 553, 366 A.2d 1216, 1220 (1976); *Commonwealth v. Williams*, 380 Pa.Super. 227, 231–32, 551 A.2d 313, 315 (1988).

In *Shoatz*, our supreme court outlined the test for determining whether abandonment has occurred, as follows:

The theory of abandonment is predicated upon the clear intent of an individual to relinquish control of the property he possesses.

Abandonment is primarily a question of intent, and intent may be inferred from words spoken, acts done, and other objective facts. All relevant circumstances existing at the time of the alleged abandonment should be considered.... The issue is not abandonment in the strict property-right sense, *but whether the person prejudiced by the search had voluntarily discarded, left behind, or otherwise relinquished his interest in the property in question so that he could no longer retain a reasonable expectation of privacy with regard to it at the time of the search.*

*Shoatz*, 469 Pa. at 553, 366 A.2d at 1219–20 (citations omitted, emphasis in original).

Unlike the analysis performed by the distinguished trial judge, which included in-depth consideration of both *Shoatz* and *Williams, supra,* my colleagues appear to place their emphasis on the federal decisions and, without relating those decisions to the facts in this case, "conclude that their rationale is persuasive." Even in the leading federal case, *Colbert,* the suspects had set their briefcases on the sidewalk, claimed they were book salesmen, denied ownership in the briefcases and began walking away from the scene, leaving the briefcases behind. It would not be unreasonable to infer that they had a clear intent to relinquish control over the property *when they began walking away.*

Contrast that to the facts now before us. The majority concedes that Bennett was the victim of a forcible detainer, with police officers flanking him on both sides, and one of the officers grabbing him by the arm. A uniformed officer also approached and stationed himself in front of Bennett, further blocking his path. It was under these circumstances, and at this point, that Officer Kaminski inquired about the duffle bag. Officer Kaminski testified as follows:

### DIRECT EXAMINATION

**BY MR. HEISTER;**

Q All right, and did you say anything after that?

A Yes, I asked—.... and I asked him if he had any baggage other than the sea bag that he was carrying with him, which of course, at that time, was against the glass doors leading into the terminal.

Mr. Bennett's response to that question was to say that he didn't have any bags. At that point, I asked him, specifically pointing at the sea bag leaning against the glass doors, "That bag over there, that sea bag is not yours?" He said, "No, it's not." Okay, at that point, I proceeded to the sea bag and began to search....

....

Q Did he say anything at all?

**A** No, other than to say that he wasn't carrying any baggage and that specific bag was not his.

**THE COURT:** You knew that not to be true,

**THE WITNESS:** That's correct.

**THE COURT:** You saw him carry the bag and set it down?

**THE WITNESS:** Yes.

**THE COURT:** You knew he had possession of the bag?

**THE WITNESS:** Right.

**THE COURT:** Even though he told you a lie, you knew this not to be true, right?

**THE WITNESS:** Correct.

Suppression Hearing Transcript, June 8, 1990, pages 21–22, 23–24, R.R., pages 53a–54a, 55a–56a.

The Majority has failed, I believe, to consider all relevant circumstances existing at the time of the alleged abandonment. It has also failed to focus on the intent of the suspect. Under neither *Shoatz* nor *Williams* could one reasonably conclude that it was Garland Bennett's clear intent to relinquish control over the sea bag, at the time he was surrounded by police officers, made no move to depart the scene or move further away from his possessions, and told a blatant lie to one of the questioning officers.

I am unaware of any Pennsylvania case that goes as far as the Majority would take our law of abandonment. Nor do I believe that our supreme court, if faced with the peculiar facts of this case, would be prepared to declare that a mere false declaration, without more and in the face of overwhelming indicia of control and intention to retain control, may suffice to establish abandonment. For these reasons, I must vigorously dissent.

Since I conclude that there was no abandonment on the facts before us, I would not consider whether the alleged abandonment had been coerced by unlawful police action. To its credit, the Commonwealth does not seek to argue that the officers had probable cause to search the defen-

630

dant's duffel bag absent abandonment. Thus, the order granting suppression was correct. *Commonwealth v. Williams, supra.*