J-S23024-17

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| v. | : | |
| RASHEED RULEY | : | |
| Appellant | : | No. 832 EDA 2016 |

Appeal from the Judgment of Sentence Dated February 16, 2016
In the Court of Common Pleas of Philadelphia County
Criminal Division at No(s):  CP-51-CR-0006092-2015

BEFORE:  OLSON, J., SOLANO, J., and MUSMANNO, J.

MEMORANDUM BY SOLANO, J.:                    **FILED JUNE 08, 2017**

Appellant, Rasheed Ruley, appeals from the judgment of sentence imposed after the trial court convicted him of violating the Uniform Firearms Act by illegally possessing a firearm, possessing a firearm without a license, and carrying a firearm on the streets of Philadelphia.[1]  We affirm.

The trial court summarized the underlying facts as follows:

> A motion-to-suppress hearing was conducted before this court on November 16, 2015.  The following facts were proved at the hearing:  Police Officer Miguel Hernandez and his partner, Police Officer Cartagena (first name not given), were in full uniform, in a marked vehicle, in the area of Litchfield Street responding to a report of a person with a gun.  The flash information they received was "a black male, dark complexion, blue jean jacket, light blue shirt, blue jeans, armed with a firearm ran into the location on 57th and Florence area."  Approximately one to two minutes elapsed from the time the flash information was received until they arrived at 5615

---

[1] 18 Pa.C.S. §§ 6105, 6106 and 6108.

Litchfield Street. When [they] observed [Appellant], he matched the exact description contained in the flash information. Officer Hernandez exited his vehicle and approached [Appellant]. [Appellant], who looked at Officer Hernandez approaching, grabbed a baby stroller he had with him and began to walk with the stroller; Officer Hernandez could not recall if he had asked [Appellant] to stop. As [Appellant] grabbed the stroller, Officer Hernandez observed the butt of a black handgun inside the left side of [Appellant's] unbuttoned denim jacket. Officer Hernandez signaled his partner in Spanish, who had also exited their patrol car, that [Appellant] had a gun. [Appellant] was stopped and [had] a loaded, black 9 mm Ruger pistol, Model C9. After the gun was recovered, [Appellant] was placed in handcuffs and without being asked a question, stated that he had found the gun in an empty lot the day before. (N.T. 11/16/15, pp. 5-14). [Appellant] was not licensed to carry a firearm. (N.T. 11/16/15, p. 15). Following argument, the motion to suppress was denied.

Trial Court Opinion, 8/3/16, at 2 (footnote omitted).

Appellant proceeded to a bench trial and was convicted of the aforementioned firearms offenses. The trial court deferred sentencing for the completion of a pre-sentence report. On February 16, 2016, the trial court sentenced Appellant to an aggregate two to four years' incarceration. Appellant filed this timely appeal in which he presents a single issue for our review:

Did not the lower court err by denying [A]ppellant's motion to suppress physical evidence where [A]ppellant was subjected to an illegal stop based solely on an anonymous tip, where the stop was unsupported by reasonable suspicion or probable cause in violation of the Fourth and Fourteenth Amendments of the United States Constitution and Article I, § 8 of the Pennsylvania Constitution, and where any statement made by [A]ppellant while he was in custody was the fruit of the illegal police conduct?

Appellant's Brief at 3.

Appellant argues that he was stopped illegally because the police lacked reasonable suspicion. **See generally**, Appellant's Brief at 7-19. Appellant specifically contends that the stop was illegal because it was based on an anonymous tip and "because he matched a generic clothing description given over police radio from an unknown source" about someone at a "different location." **Id.** Appellant claims that when he was seen by Officers Hernandez and Cartagena, he was pushing the baby stroller, and that it was only after he "was stopped by police did the officer observe the firearm." **Id.** at 7.

Conversely, the Commonwealth argues that the police saw Appellant's gun **prior** to initiating the stop of Appellant. Commonwealth Brief at 1. The Commonwealth references the trial court's recitation of Officer Hernandez's testimony that he saw the gun on the inside of Appellant's unbuttoned jacket and then arrested him. **Id.** at 5. The Commonwealth states that Appellant "rightly concedes in his brief that he grabbed the stroller before the investigatory detention took place, but wrongly concludes that Officer Hernandez did not see the gun until after the stop. His argument violates the standard of review by reading the record in his favor and seeking to overturn the suppression court's credibility determination crediting Officer Hernandez's testimony." **Id.**

At the outset, we recite our standard of review:

In addressing a challenge to a trial court's denial of a suppression motion, we are limited to determining whether the

factual findings are supported by the record and whether the legal conclusions drawn from those facts are correct. Since the Commonwealth prevailed in the suppression court, we may consider only the evidence of the Commonwealth and so much of the evidence for the defense as [] remains uncontradicted when read in the context of the record as a whole. Where the record supports the factual findings of the trial court, we are bound by those facts and may reverse only if the legal conclusions drawn therefrom are in error.

*Commonwealth v. Scarborough*, 89 A.3d 679, 683 (Pa. Super. 2014) (citation omitted), *appeal denied*, 102 A.3d 985 (Pa. 2014). In addition, our scope of review is confined to the suppression court record. *In re L.J.*, 79 A.3d 1073, 1080 (Pa. 2013).

Officer Hernandez testified that he received a report of a "black male, dark complexion, blue jean jacket, light blue shirt, blue jeans, armed with a firearm" in the area of 54th and Florence. N.T., 11/16/15, at 5-7. When he arrived at 5615 Litchfield Street within "one or two minutes" of receiving the report, he saw Appellant "matching the exact" description. *Id.* at 8. This testimony refutes Appellant's argument that he matched a "generic" description of clothing. As to Appellant's argument that he was stopped at a different location "that was neither 57th nor Florence," we may take judicial notice that 5615 Litchfield Street in Philadelphia is located within a few blocks of 57th Street and Florence Avenue.[2]

---

[2] An appellate court may take judicial notice of a fact to the same extent as a trial court. *Commonwealth v. Mitchell*, 554 A.2d 542, 548 n13 (Pa. Super. 1989) (taking judicial notice that the southeast corner of 40th and

Appellant correctly argues that the anonymous tip was insufficient to justify an investigative detention of Appellant. *See Florida v. J.L.,* 529 U.S. 266, 120 S. Ct. 1375, 1376, 146 L. Ed. 2d 254 (2000) (anonymous tip that a young black male standing at a particular bus stop and wearing a plaid shirt was carrying a gun, without more, was insufficient to justify a stop by the police where, aside from the tip, the officers had no reason to suspect illegal conduct, and the officers did not see a firearm or observe any unusual movements); *see also Commonwealth v. Jackson*, 698 A.2d 571 (Pa. 1997) (holding that police lacked reasonable suspicion to conduct a stop and frisk pursuant to *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), based solely on an anonymous tip that a person matching the

_____

Spruce Streets is located within geographical boundaries discussed in that case). Further:

> "The doctrine of judicial notice is intended to avoid the necessity for the formal introduction of evidence in certain cases when there is no real need for it, where a fact is so well established as to be a matter of common knowledge." *Albert Appeal*, 372 Pa. 13, 20, 92 A.2d 663, 666 (1952); *See Commonwealth ex rel. Duff v. Keenan*, 347 Pa. 574, 582–83, 33 A.2d 244, 249 (1943) ("so well known as to be incontestable."). Included in the subjects appropriate for judicial notice is the county in which a town or city is located, *[s]ee Emert v. Larami Corp.*, 414 Pa. 396, 200 A.2d 901 (1964); *Commonwealth v. Kaiser*, 184 Pa. 493, 39 A. 299 (1898), and the location of roads and highways. *See Schmidt v. Allegheny County*, 303 Pa. 560, 154 A. 803 (1931); *Commonwealth v. Ball*, 277 Pa. 301, 121 A. 191 (1923).

*Commonwealth v. Varner*, 401 A.2d 1235, 1236 (Pa. Super. 1979) (citations omitted).

- 5 -

suspect's description is carrying a gun). But the detention here was not based exclusively on the anonymous tip.

The court determined that Officer Hernandez saw Appellant's gun when he encountered Appellant, and that it was not until Officer Hernandez saw the gun that Appellant was legally detained. The trial court stated:

> Clearly [Appellant] in the instant case was not subjected to a non-custodial investigative detention when Officer Hernandez first approached him; this was a mere encounter that quickly escalated to an investigatory stop simply because [Appellant's] jacket inadvertently moved forward as he grabbed the baby stroller he had with him, unintentionally exposing the butt of a black handgun inside the left side of his unbuttoned denim jacket to Officer Hernandez. (N.T. 11/16/15, pp. 5-9). . . . [Appellant] was not subjected to a "stop and frisk" prior to Officer Hernandez seeing the gun. Officer Hernandez could not recall if he had asked [Appellant] to stop, but even assuming he had, his interaction with [Appellant] up to that point was still only a mere encounter; [Appellant] was not frisked.

Trial Court Opinion, 8/3/16, at 6-7. Contrary to Appellant's argument, the trial court clearly found that the police did not detain Appellant until after they saw his gun and that it was their view of the gun that justified the detention.

In analyzing police-citizen interactions, we look to the nature of the exchange between the officer and the citizen, which fall into one of three categories:

> The first of these is a "mere encounter" (or request for information) which need not be supported by any level of suspicion, but carries no official compulsion to stop or respond. The second, an "investigative detention[,]" must be supported by a reasonable suspicion; it subjects a suspect to a stop and a period of detention, but does not involve such coercive

conditions as to constitute the functional equivalent of an arrest. Finally, an arrest or "custodial detention" must be supported by probable cause.

***Commonwealth v. Gutierrez***, 36 A.3d 1104, 1107 (Pa. Super. 2012) (citation omitted). When examining whether police contact constitutes a mere encounter or an investigatory detention, we employ the following precepts:

> To determine whether a mere encounter rises to the level of an investigatory detention, we must discern whether, as a matter of law, the police conducted a seizure of the person involved. To decide whether a seizure has occurred, a court must consider all the circumstances surrounding the encounter to determine whether the demeanor and conduct of the police would have communicated to a reasonable person that he or she was not free to decline the officers' request or otherwise terminate the encounter. Thus, the focal point of our inquiry must be whether, considering the circumstances surrounding the incident, a reasonable person innocent of any crime, would have thought he was being restrained had he been in the defendant's shoes.

***Commonwealth v. Collins***, 950 A.2d 1041, 1046–47 (Pa. Super. 2008) (citation omitted) (holding that interaction between the petitioner and police was a mere encounter where the petitioner was approached in his parked car, in a public parking lot, by an officer with his police vehicle headlights activated).

> "'No constitutional provision prohibits police officers from approaching a citizen in public to make inquiries of them.' However, 'if the police action becomes too intrusive, a mere encounter may escalate into an investigatory [detention] or seizure.'" ***Commonwealth v. Beasley***, 761 A.2d 621, 624 (Pa. Super. 2000) (quoting ***Commonwealth v. Boswell***, 554 Pa. 275, 283–84, 721 A.2d 336, 339–40 (1998) (plurality)). "The term 'mere encounter' refers to certain non-coercive interactions with the police that do not rise to the level of a seizure of the

person under the fourth amendment." ***Commonwealth v. Peters***, 434 Pa. Super. 268, 642 A.2d 1126, 1129 (1994) (quoting ***Commonwealth v. Bennett***, 412 Pa. Super. 603, 604 A.2d 276, 280 (1992)). For example, a mere encounter transpires when an officer approaches a citizen on a public street for the purpose of making inquiries. ***Id.*** (quoting ***Bennett***, 604 A.2d at 280).

In contrast, "[a]n investigative detention occurs when a police officer temporarily detains an individual by means of physical force or a show of authority for investigative purposes." ***Commonwealth v. Smith***, 904 A.2d 30, 35 (Pa. Super. 2006) (quoting ***Commonwealth v. Barber***, 889 A.2d 587, 592 (Pa. Super. 2005)). In other words, in view of all the circumstances, if a reasonable person would have believed that he was not free to leave, then the interaction constitutes an investigatory detention. ***See Peters***, 642 A.2d at 1129 (quoting ***Commonwealth v. Harper***, 416 Pa. Super. 608, 611 A.2d 1211, 1215 (1992)); ***Hill***, 874 A.2d at 1218–19 (quoting ***Commonwealth v. Johonoson***, 844 A.2d 556, 562 (Pa. Super. 2004)). An investigatory detention triggers the constitutional protection of the Fourth Amendment to the United States Constitution, Article I, Section 8 of the Pennsylvania Constitution, and the prerequisites for such a detention [].

***Commonwealth v. Cauley***, 10 A.3d 321, 325–26 (Pa. Super. 2010).

On direct examination by the Commonwealth, Officer Hernandez recounted his interaction with Appellant as follows:

Q:   After you observed [Appellant], did you do anything?

A:   I exited my vehicle. I began to approach [Appellant]. At that time he looked at me. He was with a baby stroller and I believe two other young children. He immediately looked at me and grabbed the baby stroller and attempted to walk forward with the stroller. And at that time I stopped him.

Q:   Can you describe his body language? Besides looking at you, did you observe him do anything else with his body?

A:     Just a quick reaction.  Kind of tensed and grabbing the baby's stroller and attempted to walk away.

Q.     As he attempted to walk away, did you say anything to him?

A.     I believe I said, Stop, or you know, How you doing.  I didn't want to startle him or cause any kind of conflict.

Q.     Why didn't you want to startle him?

A.     In case he had a weapon or the gun.

Q.     At some point did you exit your patrol vehicle?

A.     I did at that point.

Q.     When you approached [Appellant], were you able to make any observations about his person?

A.     He was bladed towards me, Your Honor, as I approached.  As he went to grab the stroller – he had a blue denim jacket, which wasn't buttoned up.  I observed he had a black handgun inside the left side of [his] jacket.  As he leaned forward to hold onto the baby's stroller, that's when the jacket – the weight of the gun actually pulled the jacket forward and that's when I seen the handgun.  The butt of the gun was sticking out.

Q.     Approximately how far away or how close were you to [Appellant] when you were able to observe the firearm?

A.     About a foot away.

Q.     After you observed the firearm, did you do anything next?

A.     My partner exited the vehicle, also.  We both gave each other eye contact.  I signaled to my partner, you know, in Spanish that [Appellant] had a weapon.

Q.     What did you say?

A.     (Witness speaks in Spanish).

Q.    Is that language you two use often?

A.    Normally when we don't want to startle anybody, we do it as easy as possible to catch the person off guard.

Q.    Did you recover the firearm?

A.    I did.

N.T., 11/16/15, at 8-10.

In light of this testimony, the trial court correctly rejected Appellant's claim that he was illegally detained. The court explained:

It would seem to me that with the information from the flash and seeing someone that identically matches the flash that you could stop to have a conversation with someone like that and it may start off by a mere encounter. The officer's testimony was clear. He didn't recall if he said stop. It might have been that he didn't want to startle him because there were kids there. But when [Appellant] reached forward to grab the coach, is when the coat moved forward and he actually saw the weapon.

So, you know, the mere [encounter] escalates to an investigatory stop, which at that second, would have been probable cause. The officer didn't touch him. He didn't question him. He didn't do any of the indicia that normally comes along with an illegal confiscation of a weapon.

I understand [Appellant's] position is – just the flash and the mere stopping of this individual is what violates the Constitution, but an officer is allowed to, in a mere encounter setting, ask questions and [Appellant] is not compelled to stop and answer them. However, the officer's testimony was clear. Within that first initial contact with [Appellant] moving forward and his jacket comes forward, the gun was clear. And for that reason, I don't think that his Constitutional rights were violated and I would deny the motion to suppress.

*Id.* at 18-19.

We find no error in the trial court's application of the law to the facts presented at the suppression hearing. According to Officer Hernandez's uncontradicted testimony, when he approached and called to Appellant, Appellant began to walk away. Appellant thus demonstrated his belief that he was free to leave. It was not until Officer Hernandez observed the firearm that the interaction became an investigatory detention. Therefore, we conclude that the trial court did not err in denying Appellant's suppression motion.

Judgment of sentence affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 6/8/2017